IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LABMD, INC. and MICHAEL J. DAUGHERTY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 2:17-cv- |
| v. | ) | |
| | ) | Electronically Filed |
| TIVERSA HOLDING CORP.; REED SMITH LLP; CLARK HILL PLC; ROBERT J. BOBACK; JARROD D. SHAW; AND ROBERT J. RIDGE, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs LabMD, Inc. ("LabMD") and Michael J. Daugherty ("Daugherty"), by and through their undersigned counsel, bring this action against Defendants Tiversa Holding Corp. ("Tiversa"); Reed Smith LLP ("Reed Smith"); Clark Hill PLC ("Clark Hill"); Robert J. Boback ("Boback"); Jarrod D. Shaw ("Shaw"); and Robert J. Ridge ("Ridge"), and allege the following:

### NATURE OF THE ACTION

This diversity action is brought pursuant to the Dragonetti Act, 42 Pa.C.S. §§ 8351-8355, and Pennsylvania common law use and abuse of process claims to recover money damages for Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge's abusive litigation and wrongful use of civil proceedings in the Western District of Pennsylvania in *Tiversa Holding Corp. and Robert J. Boback v. LabMD, Inc. and Michael J. Daugherty*, Civil Action No. 2:13-cv-01296-NBF (the "Federal Defamation Action") and in the Allegheny County Court of Common Pleas in *Tiversa Holding Corp. and Robert J. Boback v. LabMD, Inc. and Michael J. Daugherty, Richard E. Wallace and Cause of Action Institute*, No. GD-14-016497 (the "State Defamation Action").

## PRELIMINARY STATEMENT

1.      In 2007, Tiversa, a so-called cybersecurity company, and the Federal Trade Commission began a confidential and cooperative relationship where Tiversa would use proprietary technology to hack into computers on the internet, take files containing consumers' private health and personal information, try to sell its "remediation" services to the companies that allegedly leaked those files and, for companies that refused to pay Tiversa, turn those companies in to FTC investigators so the FTC could investigate and prosecute those companies for violating Section 5 of the FTC Act.

2.      In 2008, LabMD was a highly successful cancer detection laboratory in Atlanta, Georgia.  On February 25, 2008, Tiversa hacked into a LabMD computer, stole a 1,718 page LabMD file with personal health information on over 9,000 patients (the "1718 File"), told LabMD that it found the 1718 File on the internet and threatened to report LabMD to the FTC if it did not pay Tiversa to "remediate" the alleged leak.

3.      After LabMD refused to hire Tiversa, Tiversa turned LabMD in to the FTC.  Fueled by Tiversa's lies, the FTC investigated LabMD for three and a half years and then prosecuted LabMD under Section 5 of the FTC Act.

4.      A week after the FTC filed its enforcement action against LabMD, Tiversa sued Daugherty and LabMD for defamation due to a book Daugherty wrote and was about to publish where he revealed to the public that Tiversa hacked into and stole the 1718 File from a LabMD computer and that Tiversa and the FTC were working together to investigate and prosecute LabMD.

5.      At the trial of the FTC's enforcement action against LabMD, a former Tiversa employee and whistleblower testified under criminal immunity that Tiversa's scheme with LabMD

was a fraud, that Tiversa hacked LabMD's file directly from a LabMD computer and that Tiversa falsified the evidence the FTC was using to prosecute LabMD. Several months later, an FTC administrative law judge found in favor of LabMD. After FTC Commissioners reversed their own judge, LabMD appealed the Commissioners' ruling to the United States Court of Appeals for the Eleventh Circuit.

6.      On July 3, 2017, during oral argument in *LabMD v. FTC*, in the United States Court of Appeals for the Eleventh Circuit, Case No. 16-16270, the court expressed particular concern about Tiversa and its sordid dealings with the FTC:[1]

> THE COURT: Mr. Hoffman [FTC's Appellate Counsel], is there -- is there any concern on the part of the government how this information was imparted to the FTC? This company, Tiversa, doesn't come in here with clean hands, does it?

> MR. HOFFMAN: Well, certainly Tiversa has engaged in some misconduct in connection with the –

> THE COURT: Was there collusion between Tiversa and the government?

> MR. HOFFMAN: No.

> THE COURT: Well, Counsel, let me put it this way. What -- the aroma that comes out of the investigation of this case is that Tiversa was shaking down private industry with the help of the FTC, will go to the -- with the threat of going to the FTC: "If you don't cooperate we will go to the FTC." It may well be how they got some of their clients. But that's -- that's an aroma that -- and with falsifications to the Commission. The administrative law judge just shredded Tiversa's presentation, just totally annihilated it.

> MR. HOFFMAN: I'm sorry. I mean --

> THE COURT: I -- I -- and --

> MR. HOFFMAN: So, I mean, what's -- what's -- what's -- what's -- what's the question?

> THE COURT: That -- that was a --just a -- just an observation.

---

[1] As of October 20, 2017, an audio recording of the oral argument in the referenced appeal was available at http://www.ca11.uscourts.gov/oral-argument-recordings. The transcribed portions quoted herein begin at 23:18 and end at 25:30.

THE COURT: Yeah, I'm –

MR. HOFFMAN: So I -- I mean, my --my --

THE COURT: It -- it -- it --

MR. HOFFMAN: -- my observation is that -- is that --

THE COURT: It's doesn't --

MR. HOFFMAN: -- is that Tiversa -- Tiversa's conduct is not really what's at issue here. I mean, there's no question --

THE COURT: No, no.

MR. HOFFMAN: There's no question that Tiversa engaged in serious, serious misconduct in connection with this --

THE COURT: No, and got the Commission involved in their -- in their shakedowns.

MR. HOFFMAN: I -- I don't -- I don't agree with that.

THE COURT: Oh, Counsel. Come on.

MR. HOFFMAN: I don't agree with that.

THE COURT: Oh, you -- I know, you can't agree with it. But it should have become obvious after you -- after the evidence collapsed and your -- and complaint counsel couldn't go any further.

MR. HOFFMAN: Well, again, the --

THE COURT: That has nothing to do --

MR. HOFFMAN: You're -- you're --

THE COURT: -- with whether or not --

MR. HOFFMAN: -- addressing what happened --

THE COURT: -- whether or not to --

MR. HOFFMAN: -- at the hearing --

THE COURT: -- get the Commission --

MR. HOFFMAN: -- and the Commission --

THE COURT: -- as -- it has --

MR. HOFFMAN: The Commission agreed --

THE COURT: It has nothing to do with whether the Commission has misapplied the law in its opinion. I'll buy that.

8.     Tiversa and its former chief executive officer Robert J. Boback ("Boback"), with Reed Smith and Shaw as their counsel, sued Daugherty and LabMD for defamation based upon the same false testimony and fabricated documents Tiversa and Boback gave to the FTC to use against LabMD in its enforcement action.  Tiversa and Boback have always known their evidence was false.  Tiversa's own documents prove their falsity.  Reed Smith and Shaw either knew Tiversa's evidence was false or were grossly negligent in not knowing it was false.

9.     Tiversa, Boback, Reed Smith and Shaw maliciously pursued abusive litigation against Daugherty and LabMD to harass, intimidate and antagonize Daugherty and LabMD, to deplete Daugherty and LabMD of their financial resources and, ultimately, to force Daugherty and LabMD to capitulate in their efforts to reveal Tiversa and Boback's illegal and egregious business practices.

10.     In March 2016, Tiversa dismissed its abusive litigation against Daugherty and LabMD and withdrew from representing Boback immediately after the Federal Bureau of Investigation raided Tiversa headquarters.  Defendant Ridge, who immediately took over Boback's representation in his defamation case against Daugherty and LabMD, is also Boback's criminal defense attorney.  Ridge has admitted that the Department of Justice is investigating Boback for making the same false statements to the FTC as those that support his abusive litigation against Daugherty and LabMD.  Despite overwhelming evidence of Boback's lies, Tiversa's fabricated

5

documents and the lack of any basis for Boback's defamation claims, Clark Hill and Ridge continue to abuse process by pursuing Boback's frivolous claims against Daugherty and LabMD.

## PARTIES

11.    Daugherty, a resident and citizen of the state of Georgia, is over 18 years of age.

12.    LabMD is a corporation organized and existing under the laws of the state of Georgia.  Its principal place of business is located in Fulton County, Georgia.  Daugherty is the sole shareholder of LabMD and is its president and chief executive officer.

13.    Tiversa is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 606 Liberty Avenue, Pittsburgh, PA 15222. Tiversa can be served with process through its chief executive officer, Griffin Schultz, at 606 Liberty Avenue Pittsburgh, PA 15222, or wherever he may be found.

14.    Reed Smith is a limited liability general partnership with its principal place of business at Reed Smith Center, 225 Fifth Avenue, Pittsburgh, PA 15222.  Reed Smith can be served with process through George L. Stewart II at Reed Smith Center, 225 Fifth Avenue, Pittsburgh, PA 15222, or wherever he may be found.  Reed Smith is a law firm that, on information and belief, began representing Tiversa and Boback as early as June 2013.  On further information and belief, Reed Smith continued representing Tiversa and Boback at least until March 16, 2016.

15.    On information and belief, Boback is a resident and citizen of the state of Florida. He can be served wherever he may be found.

16.    Shaw is a resident and citizen of the state of Pennsylvania who resides at 184 Fieldgate Drive, Pittsburgh, PA 15241.  Shaw can be served at 184 Fieldgate Drive, Pittsburgh, PA 15241, Tower Two-Sixty, 260 Forbes Avenue, Suite 1800, Pittsburgh, PA 15222, or wherever

he may be found.   Shaw was a partner in Reed Smith.  Shaw represented Tiversa and Boback in the Federal Defamation Action, the State Defamation Action and in the Enforcement Action.

17.   Clark Hill is a professional limited liability company with its principal place of business at 301 Grant Street, 14th Floor, Pittsburgh, PA 15219.  Clark Hill can be served with process through Robert J. Ridge, 301 Grant Street, 14th Floor, Pittsburgh, PA 15219, or wherever he may be found.  Clark Hill is a law firm that, on information and belief, began representing Boback in or around March 2016.  Clark Hill continues to represent Boback.

18.   Ridge is a resident and citizen of the state of Pennsylvania who can be served at 301 Grant Street, 14th Floor, Pittsburgh, PA 15219, or wherever he may be found.  Ridge is a partner in Clark Hill.  Ridge is Boback's criminal defense attorney who began representing Boback in or around March 2016.  Ridge entered an appearance as counsel of record for Boback in the State Defamation Action on March 10, 2016.

## JURISDICTION AND VENUE

19.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that (a) it is between citizens of different states, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

20.   Defendants Tiversa Reed Smith, Shaw, Clark Hill and Ridge are subject to the jurisdiction of this Court because they are citizens of or reside in the state of Pennsylvania.

21.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTS

10.   From at least 2001 through approximately January 2014, LabMD operated as a small, medical services company providing doctors with cancer-detection services.

11.     Tiversa is a so-called cybersecurity company that, until recently, allegedly offered breach detection, remediation and "P2P intelligence services to corporations, government agencies and individuals based on patented technologies that can monitor over 550 million users issuing 1.8 billion searches a day."

12.     Reed Smith is a law firm that was hired by Tiversa to represent it and Boback in connection with an investigation and enforcement action by the Federal Trade Commission against LabMD.  Reed Smith was also hired to represent Tiversa and Boback in the Federal and State Defamation Actions.

13.     Shaw was a partner in Reed Smith who at all times relevant to this action was Tiversa and Boback's lead counsel in the Federal and State Defamation Actions and was Tiversa and Boback's primary attorney in connection with the FTC's investigation and enforcement action against LabMD.

14.     Tiversa used several tools to search for and download computer files from peer-to-peer networks on the internet.  Regardless of which tool it used, Tiversa never sought permission to access computers or download those files, even though it knew that most of what it searched for, found and downloaded was never intended to be shared by the owners of the computers Tiversa hacked.

15.     One of the tools used by Tiversa to search for, access and download files on the internet was a software program Tiversa called Eagle Vision.

16.     Another tool used by Tiversa to search for, access and download files on the internet was proprietary law enforcement surveillance software known as EP2P.  On information and belief, in approximately 2007, then-U.S. Attorney Mary Beth Buchanan of the Western District of Pennsylvania directed the Pittsburgh office of the Federal Bureau of Investigation to provide a

copy of EP2P to Tiversa ostensibly so that Tiversa could assist the FBI with investigating child pornography.   A dedicated FBI-only DSL line was installed for Tiversa employee Richard E. Wallace to use when searching with EP2P.

17.     EP2P was not owned or developed by Tiversa.   EP2P is owned by the federal government and is used by the FBI primarily for investigating child pornography.

18.     EP2P has more capabilities to search for, access and download files from peer-to-peer networks than standard off-the-shelf peer-to-peer software programs like LimeWire.

19.     In 2007, Tiversa began acting under color of federal law as a government instrument or agent for the Federal Trade Commission.

20.     Investigators at the Federal Trade Commission who were responsible for the relationship with and use of Tiversa as a government agent include, but are not limited to, Alain Sheer, Ruth Yodaiken, Carl Settlemyer, Jr. and Laura VanDruff.

21.     Tiversa ostensibly used EP2P to assist the FBI and FTC for government purposes. Its primary motive, however, was to use the government software for commercial gain.

22.     On February 25, 2008, Tiversa employee Richard E. Wallace used EP2P on Tiversa's dedicated FBI-only DSL line to search for, access and download from a LabMD billing computer in Atlanta, Georgia, a 1,718-page LabMD file containing confidential personal health information (the "1718 File").   Tiversa's search, download, retention and subsequent distribution of the 1718 File was in violation of several state and federal crimes, including 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information).

23.     On May 13, 2008, Boback made a cold call to LabMD to inform it that Tiversa had "found" LabMD's 1718 File on the internet and that Tiversa was available to help LabMD

remediate the alleged leak of the file.  Boback did not disclose that, in truth, Tiversa used EP2P to locate and surreptitiously hack directly into a LabMD computer to take the 1718 File from LabMD.

24.     After Tiversa's initial cold call, LabMD investigated and determined that, unbeknownst to LabMD, a software application known as LimeWire was installed on a LabMD billing computer.  LabMD removed the LimeWire application right away.  LabMD came to learn that Tiversa obtained the 1718 File by illegally entering into and taking it from LabMD's billing computer.

25.     Boback's May 13, 2008 call to LabMD was the first in a series of aggressive sales efforts to convince LabMD to purchase its remediation services.

26.     Tiversa even used attorneys and threats to coerce LabMD into hiring Tiversa.  On November 21, 2008, Jim Cook, an attorney hired by Joel Adams, Tiversa's chairman of the board, told an attorney for LabMD that Tiversa was concerned that it had to report its finding of the 1718 File to the FTC.

27.     Cook's implicit threat to turn LabMD in to the FTC did not motivate LabMD to hire Tiversa.

28.     When Boback learned that Mike Daugherty at LabMD ultimately refused to do business with Tiversa, Boback said to Rick Wallace, one of Tiversa's analysts, "f--- him, make sure he's at the top of the list."  The "list" was a spreadsheet of approximately 100 companies Tiversa would soon give the FTC that included companies whose files were taken by Tiversa and who refused to hire Tiversa to remediate Tiversa's breaches (the "List").

29.     Tiversa's scheme was the same for each company on the List.  Tiversa hacked confidential files from those companies, sent the stolen files to the potential customers, told the potential customers, fraudulently, that the disclosed files had spread to additional computers on

the internet, including computers of known bad actors (*e.g.*, identity thieves), and tried to extort the companies into buying Tiversa's services.

30.     In late 2008 or 2009, in furtherance of Tiversa's relationship with the FTC, Tiversa outside counsel Eric Kline, Boback and FTC investigators Alain Sheer and Ruth Yodaiken agreed that in order to keep Tiversa's cooperation and relationship with the FTC a secret, Tiversa would create a shell company known as The Privacy Institute through which Tiversa would funnel the List and other documents to the FTC investigators for the FTC to use in its investigations and prosecutions of companies that allegedly leaked confidential consumer information on the internet.

31.     Kline incorporated The Privacy Institute in June 2009 and gave the List and other documents to the FTC investigators several weeks later.  Although Tiversa had told LabMD that it did not take the 1718 File from a LabMD computer, the documentation Kline produced to the FTC proves that Tiversa had downloaded the 1718 File *directly* from a LabMD computer on February 25, 2008.

32.     On information and belief, Tiversa attorney Kline knew that Tiversa's allegations that it did not find the 1718 File on a LabMD computer were fraudulent.  On further information and belief, Kline shared his knowledge with Reed Smith and Shaw before they filed the Federal Defamation Action on Tiversa and Boback's behalf.

33.     By letter dated January 19, 2010, FTC Investigator Alain Sheer informed LabMD that the FTC was "conducting a non-public inquiry into LabMD's compliance with federal law governing information security."  The letter states, "According to information we have received, a computer file (or files) from your computer network is available to users on a peer-to-peer file sharing ("P2P") network (hereinafter, "P2P breach")."  In truth, no LabMD files were available to anyone using peer-to-peer file sharing software because LabMD had removed the offending

LimeWire software from its billing computer in May 2008.   The source of Sheer's false information was Tiversa.

34.      The FTC's investigation of LabMD and Daugherty continued for three and a half years.  It was an intrusive and exhaustive inquisition where FTC investigators issued burdensome voluntary access requests and civil investigative demands, terrifying and demoralizing LabMD staff and management.  LabMD and Daugherty produced thousands of pages of documents, sat for hours of interviews and met with the FTC on numerous occasions by telephone and in person, only to be told by the FTC investigators, time after time, that LabMD's responses were inadequate. Tiversa was fueling the FTC's investigation with false information.

35.      On July 19, 2013, Daugherty posted a promotional trailer on the internet for *The Devil Inside the Beltway*, a book he had written about his ordeal with Tiversa and the FTC.  The book, which was published in mid-September 2013, exposed Tiversa's theft of the 1718 File, the confidential relationship between the FTC and Tiversa and the FTC and Tiversa's abuse of Daugherty's small cancer detection laboratory.

36.      The FTC filed an administrative enforcement action against LabMD on August 28, 2013.

37.      Tiversa's use of the FTC as a retaliatory weapon against LabMD had been extremely costly, disruptive and harmful to Daugherty and LabMD but Tiversa's scheme was about to backfire.  LabMD would have the right to take discovery from Tiversa in the enforcement action and thereby potentially expose (1) Tiversa's collusion with the FTC; (2) Tiversa's fraudulent business practices; (3) Tiversa's lies regarding the 1718 File; and (4) Tiversa's illegal use of EP2P to spy on and steal from U.S. citizens (collectively the "Concealed Misconduct").

38.     In response to the threat of exposing the Concealed Misconduct, Tiversa, Boback, Reed Smith and Shaw developed a multi-step plan where Tiversa, Boback, Reed Smith and Shaw would eventually (1) sue Daugherty and LabMD in state and federal courts in Pittsburgh for meritless defamation and conspiracy claims; (2) drain Daugherty and LabMD of their limited resources; (3) chill the sales of *The Devil Inside the Beltway*; (4) divert Daugherty and LabMD's attention away from taking discovery and defending LabMD in the enforcement action; (5) retaliate against Daugherty and LabMD for refusing to do business with Tiversa, for refusing to settle with the FTC and for pursing discovery against Tiversa in the enforcement action; (6) intimidate, harass and antagonize Daugherty and LabMD to wear them down and force them to capitulate; (7) terminate an employee (Wallace) who refused to lie for Tiversa in the enforcement action; (8) hire private investigators (CSI and InPax) to investigate, intimidate, harass, photograph, track, trail, antagonize and surveil witnesses and their family members; (9) have Boback contact the Gartner Group, Black Hat and other organizers of events where Daugherty would be speaking to defame and impugn the character of Daugherty to ruin his speaking career; (10) direct Tiversa employee Keith Tagliaferri to create a false report regarding the alleged spread of the 1718 File; (11) coordinate efforts with and assist the FTC in its prosecution of LabMD; (12) give false testimony in two depositions in the enforcement action (Boback); (13) interfere with LabMD's efforts to obtain immunity for a whistleblower (Wallace); (14) with Reed Smith and Shaw's assistance, author and publish defamatory statements about Daugherty and LabMD including, without limitation, Boback's February 10, 2015 statements published in the Pathology Blawg and Boback's December 9, 2015 statements published in The Wall Street Journal; (15) attempt to intimidate and drain LabMD's pro bono law firm of its financial resources and divert its attention away from defending LabMD in the enforcement action; (16) foster and disseminate Tiversa's lies

about finding the 1718 File on the computers of known bad actors; (17) fabricate supporting evidence for the FTC to use in its prosecution of LabMD and for Tiversa to use in its defamation lawsuits against LabMD and Daugherty; (18) coerce Tiversa chief technology officer Anju Chopra to sign a false affidavit; and, upon information and belief, (19) conspire with former U.S. Attorney Mary Beth Buchanan to conceal Tiversa's illegal use of EP2P.

39.    Tiversa, Boback, Reed Smith and Shaw's first step was to file a meritless defamation lawsuit in the Western District of Pennsylvania against LabMD and Daugherty – the Federal Defamation Action.  Tiversa, Boback, Reed Smith and Shaw timed the filing of that action to coincide with the filing of the FTC's enforcement action against LabMD in order to create a double assault on Daugherty and LabMD.  A true and correct copy of the initial complaint in the Federal Defamation Action is attached hereto, marked as Exhibit A and incorporated herein by reference.

40.    The September 5, 2013 complaint in the Federal Defamation Action included eight meritless counts including a request for the court to impose a prior restraint on the upcoming publication of *The Devil Inside the Beltway.*

41.    Tiversa, Boback, Reed Smith and Shaw made the following false allegations in the Federal Defamation Action:

17. In 2008, while conducting searches of a P2P network, Tiversa found a 1,718 page document containing healthcare patient social security numbers, insurance information, and treatment codes (the "File").

18. The File, while created and stored on a LabMD computer, was accessible to Tiversa and others only because that LabMD computer had allowed access to the File via the P2P network which Tiversa was searching.

19. In May of 2008 Mr. Boback, on behalf of Tiversa, contacted LabMD to alert it to the publicly available nature of the file. Mr. Boback and Tiversa also provided a copy of the File to LabMD to confirm that it was indeed LabMD's document.

20. After informing LabMD of the availability of its file, Mr. Boback offered Tiversa's remediation services to LabMD to assist it in securing the File and ensuring that no other breaches of confidentiality took place.

25. Subsequent to the hearings the FTC visited Tiversa, and attempted to obtain any and all non-redacted files which contained more than 100 Social Security Numbers.

26. Under threat of federal subpoena all such files, including the File, were provided to the United States Government.

27. Tiversa has never received any payment, of any form, from the FTC for this activity.

28. Tiversa did not have any insight or control as to what the FTC was planning to do, or did, with this information once received by the FTC.

33. In his video "trailer" for the Book, available on Mr. Daugherty's personal website, Mr. Daugherty highlights his position as LabMD's President and CEO and Mr. Daugherty alleges that Tiversa is part of a "Government Funded Data Mining & Surveillance" scheme that engages in "Psychological Warfare" and helps to assist in "Abusive Government Shakedown[s]." See www.michaeljdaugherty.com. More specifically, Mr. Daugherty alleges Tiversa is conducting "300 Million Searches per day" for "Homeland Security" and the "Federal Trade Commission." See id.

34. Mr. Daugherty further claims that Tiversa "downloaded" the File "and would not answer our questions unless we hired them, kicked the file over to the feds, and then the federal trade commission began overwhelming our small business, a cancer detection center, with their beltway tactics." See id. See also Video of Heritage Foundation Blogger Brief (stating that Tiversa and Mr. Boback wouldn't "give [LabMD] any information unless we hired him which I wouldn't do" that "we, to this day, don't feel like our file ever got out" and that "we don't even believe that there was a breach"); www.michaeljdaugherty.com/2012/09/16/the-ftc-is-suing-me/ (alleging that Tiversa "took our file without authorization"); Amy Wenk, Atlanta Medical Lab Facing Off Against FTC, Atlanta Business Chronicle, September 7-13, p. 3A, 22A ("'This is a property theft case,' Daugherty said. '[Tiversa] came in and affected our network'"); www.indiegogo.com/projects/the-devil-inside-the-beltway/ (stating, on a website created by Mr. Daugherty, that "[w]hat began with the unauthorized but government-funded procurement of medical data for 9000+ patients from his medical laboratory turned into a government supported, financially draining, extortion attempt"); Interview by Accuracy in Media with Michael J. Daugherty, available at www.michaeljdaugherty.com/media (stating that Tiversa "did not find [the File] out on cyberspace", that "the [F]ile was taken by a government funded study and a group from Dartmouth and a company named Tiversa", and that Tiversa "took" LabMD's property).

35. Mr. Daugherty further alleges that "the feds" are "paying contractors to surveil for medical files[.]" See Trailer for The Devil Inside the Beltway.

36. In essence, Mr. Daugherty has stated, in many different mediums, that Tiversa illegally accessed and stole LabMD's files, and then extorted LabMD in an attempt to obtain business. When LabMD refused, according to Mr. Daugherty, Tiversa sent the files to the FTC, to begin an investigation into LabMD.

41. The Defendants have willfully, intentionally, wantonly, maliciously, and repeatedly spread their allegations regarding a Pennsylvania resident both throughout this Commonwealth and the country.

42. Mr. Daugherty and LabMD's accusations regarding Mr. Boback's and Tiversa's conduct are false.

44. The statements made by Mr. Daugherty and LabMD, discussed in Paragraphs 32-37, are defamatory in character as they have diminished the Plaintiffs' reputations – both commercially and personally – and have hurt the Plaintiffs' business and profession, by, inter alia, casting doubt on the Plaintiffs' operations as a businessman and business that operates legally, ethically, and honestly.

52., 64., 70.,  82. and 88.  Defendants' conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on Defendants' part. Defendants had an appreciation for, and consciously disregarded, the risk of harm to Plaintiffs which their conduct entailed.

54. The spoken words of Defendants, discussed in Paragraphs 32-37, impute both the criminal offense and business misconduct of extortion upon the Plaintiffs.

60. The statements made by Defendants, discussed in Paragraphs 32-37, are false.

63. Defendants knew their statements were false and/or acted in reckless disregard of the truth or falsity of the statements.

66. The Defendants, in connection with advertising the Book, made both false and misleading descriptions of fact, as well as false and misleading representations of fact, misrepresenting the nature and characteristic of the Plaintiffs' services and commercial activities by, inter alia, making the false statements discussed in Paragraphs 32-37.

72. The statements discussed in Paragraphs 32-37 are false.

73. Defendants have no privilege that would allow them to make these false statements.

80. The statements made by Defendants were false, and Defendants had no privilege or justification for making them.

84. The statements discussed in Paragraphs 32-37 were intentionally made.

85. *Inter alia*, the falsity of these statements, combined with the serious nature of

their content and the significant repercussions the statements have had on Mr. Boback, render the conduct of making the statements extreme and outrageous.

42.      The allegations set forth above are false because (1) Tiversa illegally hacked into and took the 1718 File from a LabMD computer in Atlanta, Georgia on February 25, 2008, without LabMD's knowledge, authority or permission; (2) Tiversa illegally used law enforcement surveillance software owned by the federal government to search for, access and download the 1718 File from LabMD's computer; (3) the taking of the 1718 File violated several state and federal criminal statutes including, without limitation, 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information); (4) Tiversa never located or downloaded the 1718 File from any computer other than LabMD's computer in Atlanta, Georgia; (5) Tiversa's internal documents establish that Tiversa took the 1718 File *directly* and *solely* from a LabMD computer in Atlanta, Georgia; (6) Tiversa never located or downloaded the 1718 File from a computer in San Diego, California; (7) the 1718 File never "spread" anywhere in cyberspace; (8) the 1718 File was never found or downloaded from computers of known bad actors (*e.g.,* identity thieves); (9) the 1718 File was never publicly available; (10) LabMD did not leak the 1718 File; (11) Tiversa leaked the 1718 File; (12) Tiversa partnered with Dartmouth College to search for and take the 1718 File as part of a federally-funded study by Dartmouth; (13) Tiversa, through its attorney Jim Cook, threatened to turn LabMD in to the FTC if LabMD did not hire Tiversa; (14) Tiversa gave the FTC a list of approximately 100 companies Tiversa claimed leaked confidential files on the internet (some or all of those companies had rejected Tiversa's solicitations of business); (15) Tiversa attorney Eric Kline created The Privacy Institute at the suggestion of FTC investigator Ruth Yodaiken as a means for Tiversa to funnel documents to the FTC in secret; (16) Neither Tiversa nor The Privacy Institute ever produced anything to the FTC under "threat;" (17) Tiversa's reward for turning companies in to the FTC was its receipt of more business due, for example, to

prospective customers' fear of FTC investigations and prosecutions; (18) The FTC helped Tiversa secure more business by giving it advance notice of the companies to whom it was sending inquiry letters; (19) Tiversa's documentary evidence that Tiversa located and downloaded the 1718 File from a computer in San Diego, California (*e.g.*, CX0019, Chopra Affidavit) was fabricated; (20) Tiversa's documentary evidence of spread of the 1718 File (*e.g.*, CX0019, Chopra Affidavit) was fabricated; and (21) Boback's testimony regarding the alleged spread of the 1718 File was false.

43.     Each of the false allegations in the Federal Defamation Action, which also constituted defamation per se pursuant to 42 Pa.C.S. §§ 8353, injured the reputations of Daugherty and LabMD and chilled the sales of *The Devil Inside the Beltway*.

44.     The Federal Defamation Action caused Daugherty to suffer emotional distress.

45.     Tiversa, Boback, Reed Smith and Shaw knew or should have known from conversations with Tiversa outside counsel Eric Kline that there was no documentary evidence that Tiversa ever found the 1718 File anywhere other than on LabMD's billing computer in Atlanta, Georgia.

46.     Tiversa and Boback knew and Reed Smith and Shaw knew or should have known from a review of Tiversa's own documents that Tiversa never found the 1718 File anywhere other than on LabMD's billing computer in Atlanta, Georgia.

47.     Tiversa and Boback knew and Reed Smith and Shaw knew or should have known from Tiversa employee Richard E. Wallace that Tiversa never found the 1718 File anywhere other than on LabMD's billing computer in Atlanta, Georgia.

48.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the claims in the Federal Defamation Action were invalid.

49.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the allegations in the Federal Defamation Action were false.

50.     Tiversa, Boback, Reed Smith and Shaw had no probable cause for the complaint in the Federal Defamation Action.

51.     Neither Tiversa, Boback, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in the Federal Defamation Action were based.

52.     Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of the Federal Defamation Action was not intended to merely harass or maliciously injure Daugherty and LabMD.

53.     Neither Tiversa nor Boback reasonably believed in the existence of facts upon which the claims in the Federal Defamation Action were based due to reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

54.     On the same day Tiversa and Boback filed the Federal Defamation Action against Daugherty and LabMD, September 5, 2013, Boback wrote and sent an internal email to Tiversa employees Dan Kopchak and Molly Trunzo, a true and correct copy of which is attached hereto, marked as Exhibit B and incorporated herein by reference (the "September 5, 2013 Email"). Boback admitted the following in the September 5, 2013 Email:

> In 2008, while doing work for a client, our systems downloaded a file (1,718 page pdf) that contained sensitive information including SSNs and health information for over 9000 people.  The file had the name "LabMD" in both the header of the file and the metadata. The IP of the download was found to be in Georgia, which after a Google search, is where we found LabMD's office to be located.

55.     After September 5, 2013, Tiversa and Boback and, on information and belief, Reed Smith and Shaw decided that Tiversa would fabricate evidence to falsely show that Tiversa

accessed and downloaded the 1718 File through a computer located in San Diego, California with

an Internet Protocol Address of 68.107.82.250.

56.     By letter dated October 17, 2013 to LabMD's counsel, Jarrod Shaw represented the

following statement

[T]he evidence will indisputably show that Tiversa and Mr. Boback did not access, take, "invade" or ever obtain the File through a LabMD computer.

57.     Shaw either knew this statement was false or was grossly negligent in not knowing

it was false.

58.     Tiversa's internal documentation, including the September 5, 2013 Email,

contradicted Shaw's allegation and proved that Tiversa downloaded the 1718 File *directly* and *only*

from a LabMD computer in Atlanta, Georgia, on February 25, 2008.

59.     In the same October 17, 2013 letter, Shaw told the fabricated story about Tiversa

finding the 1718 File on a computer in San Diego:

Moreover, the evidence will also show that the Plaintiffs accessed the File through a computer located in San Diego - and not the LabMD Computer - with an Internet Protocol Address of 68.107.82.250. Thus, any and all statements asserting or implying that the Plaintiffs accessed the File through a LabMD computer are demonstrably incorrect.

60.      Shaw either knew this statement was false or was grossly negligent in not knowing

it was false.

61.     On November 1, 2013, in response to a subpoena served on Tiversa by the FTC,

Shaw produced documents to FTC attorney Laura VanDruff under a cover letter marked "Private

and Confidential."  Even though the subpoena called for its production, Shaw did not produce the

September 5, 2013 Email where Boback admitted that Tiversa downloaded the 1718 File directly

from LabMD's computer.  Instead, Shaw produced a fabricated document purporting to show that

Tiversa located and downloaded the 1718 File (with file name "insuranceaging_6.05.071") from

four computers on the internet at the following IP addresses and on the following dates and times:

| | | |
|---|---|---|
| 173.16.83.112 | 11/5/2008 @ 11:26pm | [173.16.83.112]insuranceaging_6.05.071 |
| 68.107.85.250 | 2/05/2008 @ 3:49pm | [68.107.85.250]insuranceaging_6.05.071 |
| 201.194.118.82 | 4/7/2011 @ 2:22am | [201.194.118.82]insuranceaging_6.05.071 |
| 90.215.200.56 | 6/9/2011 @ 8:13am | [90.215.200.56]insuranceaging_6.05.071 |

62.     The document produced by Shaw to the FTC, a copy of which is attached hereto

and marked as Exhibit C, was marked by the FTC in its enforcement action against LabMD as

Exhibit CX0019.  The FTC used this evidence to prove that LabMD allowed the 1718 File to

spread through cyberspace.

63.     CX0019 is a fabricated document containing false evidence.  It is false because

Tiversa never located or downloaded the 1718 File from any of the computers identified in

CX0019.

64.     Shaw either knew CX0019 was fabricated or was grossly negligent in not knowing

it was fabricated.

65.     Tiversa, Boback, Reed Smith and Shaw did *not* produce on November 1, 2013, or

at any other time since, another internal document proving that Tiversa downloaded the 1718 File

*directly* and *solely* from a LabMD computer in Atlanta.  On or about April 18, 2008, Tiversa

prepared and sent to CIGNA a forensic report regarding the 1718 File (the "CIGNA Report").  The

report, a true and correct copy of which is attached hereto, marked as Exhibit D and incorporated

herein by reference, states, "[a]fter reviewing the IP address resolution results, meta-data and other

files, Tiversa believes it is likely that **LabMD near Atlanta, Georgia is the disclosing source** [of

the 1718 File]." (Emphasis added).

66.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly

negligent in not knowing from a review of the CIGNA Report and the September 5, 2013 Email

that Tiversa never found the 1718 File anywhere other than on LabMD's billing computer in Atlanta, Georgia.

67.     On November 21, 2013, Boback knowingly and falsely testified in the enforcement action that Tiversa found the 1718 File on computers at the four locations identified in CX00019. According to Boback, those computers were in San Diego, California; Apache Junction, Arizona; London, England; and San Jose, Costa Rica.  Boback also testified that those computers were known to have been used by identity thieves and other bad actors.

68.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that Boback's testimony regarding CX0019 was false.

69.     On December 24, 2013, Tiversa, Boback, Reed Smith and Shaw filed an amended complaint in the Federal Defamation Action,  a true and correct copy of which is attached hereto, marked as Exhibit E and incorporated herein by reference.  Despite the September 5, 2013 Email and the CIGNA Report, Tiversa, Boback, Reed Smith and Shaw made the following false allegations:

> 11. In 2008, Tiversa was performing services on behalf of a client which included searching the P2P network for specific search terms. During that search, a file containing those search terms was located on a computer in San Diego. Accordingly, Tiversa, as part of Tiversa's services for the client, downloaded the file containing the search term(s) along with other files that were contained on the computer in San Diego. One of those additional documents was a 1,718 page document containing healthcare patient social security numbers, insurance information, and treatment codes (the "File").

> 13. The File, while believed to be created and stored on a LabMD computer, was available to Tiversa and others only because that LabMD computer had downloaded LimeWire, a P2P sharing application. By downloading LimeWire, LabMD allowed access to the File via the P2P network which Tiversa was searching.

> 14. The File was not downloaded by Tiversa from a LabMD computer. Instead, the first time Tiversa downloaded the File was from a computer located in San Diego. Thereafter, as part of its services for various clients, Tiversa downloaded the File three additional times from computers located in Arizona, Costa Rica, and London.

15. Tiversa never accessed the File from a LabMD computer.

21. Armed with this knowledge, the FTC visited Tiversa, and attempted to obtain any and all non-redacted files which contained more than 100 Social Security Numbers.

22. Tiversa refused to produce anything directly to the FTC. Instead, an entity called the Privacy Institute was created and the FTC served that entity with a Civil Investigative Demand pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1 (the "CID"). The CID did not specifically identify Defendants.

23. On August 18, 2009 the Privacy Institute responded to the CID.

28. The Defendants made defamatory statements regarding the Plaintiffs before, in, and after the publication of the Book.

29. In his video "trailer" for the Book, available on, inter alia, Mr. Daugherty's personal website, Mr. Daugherty highlights his position as LabMD's President and CEO and Mr. Daugherty alleges that Tiversa is part of a "Government Funded Data Mining & Surveillance" scheme that engages in "Psychological Warfare" and helps to assist in "Abusive Government Shakedown[s]." See www.michaeljdaugherty.com.  More specifically, Mr. Daugherty alleges Tiversa is conducting "300 Million Searches per day" for "Homeland Security" and the "Federal Trade Commission." See id.

30. Mr. Daugherty further claims that Tiversa "downloaded" the File "and would not answer our questions unless we hired them, kicked the file over to the feds, and then the federal trade commission began overwhelming our small business, a cancer detection center, with their beltway tactics." See id. See also Video of Heritage Foundation Blogger Brief (stating that Tiversa and Mr. Boback wouldn't "give [LabMD] any information unless we hired him which I wouldn't do" that "we, to this day, don't feel like our file ever got out" and that "we don't even believe that there was a breach"); www.michaeljdaugherty.com/2012/09/16/the-ftc-is-suing-me/ (alleging that Tiversa "took our file without authorization"); Amy Wenk, Atlanta Medical Lab Facing Off Against FTC, Atlanta Business Chronicle, September 7-13, p. 3A, 22A ("'This is a property theft case,' Daugherty said. '[Tiversa] came in and affected our network'"); www.indiegogo.com/projects/the-devil-inside-the-beltway/ (stating, on a website created by Mr. Daugherty, that "[w]hat began with the unauthorized but government-funded procurement of medical data for 9000+ patients from his medical laboratory turned into a government supported, financially draining, extortion attempt"); Interview by Accuracy in Media with Michael J. Daugherty, available at www.michaeljdaugherty.com/media (stating that Tiversa "did not find [the File] out on cyberspace", that "the [F]ile was taken by a government funded study and a group from Dartmouth and a company named Tiversa", and that Tiversa "took" LabMD's property); Interview by Tea Party News Network with Michael J. Daugherty, available at http://www.youtube.com/watch?v=-x6UDWwdevw (stating that "Homeland Security paid [Tiversa] to surveil 4.5 million workstations around the world" and that "Homeland Security gave $24 million dollars to

Dartmouth and Tiversa to go out and surveil the web"); Interview by The Mike Huckabee Show, available at http://www.mediafire.com/listen/anqxg16hdbay4hg/Michael+ Daugherty+9+23+13.mp3 (stating, in response to the assertion "this sounds like a blackmail case" that "I can say we felt something really bad was going on" and that "no one was willing to help us or educate us unless we paid them", that "we couldn't get any more information from [Tiversa] unless we were willing to sign a services agreement which we considered it was nefarious", that "Homeland Security gave a $24 million dollar grant to Dartmouth who worked with Tiversa to go and they use the word 'monitor' for files", that "the left hand took it and the right hand's slapping me", that "the next thing you know the FTC has [the File] and they're investigating me. It was quite clubby", responding to the question "somebody is able to infiltrate into your system, and I guess like a vacuum cleaner suck everything out of it, and then make copies of all those records; is that essentially what happened?" with the response of "Yea, we lost stuff", and responding to the statement that "I might leave a lawnmower in my yard, so it could be accessible, but … nobody just has a right to come by and take it home with them" with the assertion "right, it's shocking"); Interview by Book Bliss of Michael J. Daugherty, available at http://bookbliss.com/2013/06/19/the-devil-inside-the-beltway/ (stating that "the government funded Dartmouth and this company Tiversa to go out and conduct a study, and to go surveil peer to peer networks").

31. Mr. Daugherty further alleges that "the feds" are "paying contractors to surveil for medical files[.]" See Trailer for The Devil Inside the Beltway.

33. Although they are far too numerous to list in their entirety, the Book, at 493 pages, offers a host of defamatory statements.1 See e.g., Book, p. 282 (calling Mr. Boback "a con artist"), p. 419 ("LabMD got entrapped"), p. 405 ("How about entrapment?"), p. 89 (stating that Tiversa was part of "the one-two entrapment strategy"), p. 359 ("It wasn't until LabMD declined to engage Tiversa's 'security services' … and then sued Tiversa … that the FTC was compelled to issue the present CID. This unusual timing only serves to incentivize organizations to pay off Tiversa (as non-payment appears to coincide with the opening of an FTC investigation)"), p. 310 (discussing "Tiversa's 'pay or no play' program"), p. 279 (describing a conversation in which "Bloomberg" described Tiversa's business model as a "shakedown", and that Tiversa engaged in "[q]uestionable practices, to say the least"), p. 375 ("Tiversa regularly contacted companies whose file they had taken in order to solicit business"), p. 309 (stating that Tiversa and Mr. Boback were attempting "to exploit a medical facility"), p. 325 (describing the parties' interactions as "a theft case"), id. ("Isn't this nothing more than a flat-out case of theft?"), p. 111 (stating that Mr. Daugherty and LabMD "had used the terms 'hustler' and 'oily salesman' to describe" Mr. Boback), p. 276 ("You sneaky snake. How dare you, Tiversa, hold up our property as a means to scare others so you can close more business"), id. (describing Tiversa as "Nasty"), p. 355 (calling Tiversa "invaders" who had perpetrated an "injustice"), p. 53 ("I really hate it that Boback turned this over to the FTC. I feel like we're being punished for not hiring Tiversa. … . Was it just me, or did something stink?"), p. 68 ("[A] security firm swip[ed] our stuff and then turn[ed] it in to the FTC"), p. 33 ("How much do you want to bet they're throwing us under the bus because I wouldn't hire them?"), id. ("Tiversa—a company that had just become even more soulless to me, if that was possible"), id. ("I know I wouldn't

sell my soul to this particular devil no matter what the consequence"), p. 51 ("We know who took the goods"), p. 109 ("I bet he threw us under the bus because we wouldn't sign his services agreement! … . That hypocrite showed our file to Congress! He has the nerve to try to get us to pay him $40,000 and then sits in front of those representatives like he's a saint?"), p. 119 ("Tiversa collected (a.k.a. took with surveillance software) more than 3,000 files"), p. 276 ("Sounds like surveillance to me. Hey Tiversa … who is watching you watching us?"), p. 325 ("Tiversa should have been aware of the confidential nature of the information when they opened a port and entered our workstation and downloaded our file"), p. 326 (comparing the United States government and Tiversa to "Queen Elizabeth I sending Walter Raleigh to loot Spanish ships"), id. (claiming that Tiversa "use[d] software to remotely open our door locks"), p. 374
 (stating that Tiversa "t[oo]k[] someone's property"), p. 390 (stating that Tiversa was "snooping on the internet for other people's property or sensitive private data").

35. In essence, Mr. Daugherty has echoed, in many different mediums, the main crux of the Book: that Tiversa and Mr. Boback illegally accessed and stole LabMD's files, and then extorted LabMD in an attempt to obtain business. When LabMD refused, according to Mr. Daugherty, Tiversa and Mr. Boback sent the files to the FTC, to begin an investigation into LabMD. Thus, Mr. Daugherty and LabMD have accused Tiversa and Mr. Boback of being criminals, who have engaged in crimes involving crimen falsi, by being thieves, extortionists, con artists and parties to a government conspiracy somehow intended to defraud Mr. Daugherty and LabMD.

36. On November 8, 2012 – nearly a year prior to the publication of the Book – counsel for Tiversa sent a letter to LabMD's in-house counsel regarding the kind of statements discussed in Paragraphs 29-35.

37. That letter stated that the kind of statements discussed in Paragraphs 29-35 were false, as well as damaging to Tiversa, and must therefore be halted immediately.

38. As described in Paragraphs 29-35, Defendants disregarded the November 8, 2012 letter entirely by making statements, and publishing the Book. Those statements, and the Book, therefore, were made with knowledge of their falsehood or reckless disregard for the fact that they were false.

39. On October 17, 2013 – after publication of the Book – counsel for Plaintiffs sent a letter to counsel for the Defendants. This letter explicitly noted that Mr. Daugherty, LabMD, and the Book had all asserted that the Plaintiffs "took" the File from a LabMD computer. The letter continued to make clear that the Plaintiffs did not "take" the File from a LabMD computer, but instead accessed the File from a computer located in San Diego and that Plaintiffs never obtained the File from Defendants' computer. [Defendant Shaw's October 17, 2013 letter contains false statements, as discussed elsewhere in this Complaint].

40. Thus, the October 17, 2013 letter made clear that Plaintiffs did not take the file from a LabMD computer, or otherwise have any contact with a LabMD computer.

41. Mr. Daugherty and LabMD have made statements to the contrary subsequent to their receipt of the October 17, 2013 letter, see supra, and thus those statements, among others, were made with knowledge of their falsehood or reckless disregard for the fact that they were false.

42. The Defendants have willfully, intentionally, wantonly, maliciously, and repeatedly spread their allegations, targeted to Pennsylvania, regarding Pennsylvania residents, and with knowledge that those allegations would cause harm to those Pennsylvania residents in this Commonwealth.

43. The Defendants' accusations regarding Mr. Boback's and Tiversa's conduct are false.

65. The statements made by Mr. Daugherty and LabMD, discussed in Paragraphs 29- 35, are defamatory in character as they have diminished the Plaintiffs' reputations – both commercially and personally – and have hurt the Plaintiffs' business and profession, by, inter alia, casting doubt on the Plaintiffs' operations as a businessman and business that operates legally, ethically, and honestly.

72. There is no conditionally privileged occasion which exists to allow Defendants to have made the defamatory statements. In the alternative, Defendants, as demonstrated above, have abused a conditionally privileged occasion to the extent any exist, which Plaintiffs deny.

73. Defendants knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Defendants have acted with actual malice.

74., 81., 88. and 94.   Defendants' conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on Defendants' part. Defendants had an appreciation for, and consciously disregarded, the risk of harm to Plaintiffs which their conduct entailed.

80. Defendants knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Defendants have acted with actual malice.

83. The statements made by Defendants, discussed in Paragraphs 29-35, are false.

84. Defendants had no privilege to make these statements.

87. Defendants knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Defendants have acted with actual malice.

70.     The allegations set forth above are false because (1) Tiversa illegally hacked into and took the 1718 File from a LabMD computer in Atlanta, Georgia on February 25, 2008, without LabMD's knowledge, authority or permission; (2) Tiversa illegally used law enforcement surveillance software owned by the federal government to search for, access and download the 1718 File from LabMD's computer; (3) the taking of the 1718 File violated several state and federal criminal statutes including, without limitation, 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information); (4) Tiversa never located or downloaded the 1718 File from any computer other than LabMD's computer in Atlanta, Georgia; (5) Tiversa's internal documents establish that Tiversa took the 1718 File *directly* and *solely* from a LabMD computer in Atlanta, Georgia; (6) Tiversa never located or downloaded the 1718 File from a computer in San Diego, California; (7) the 1718 File never "spread" anywhere in cyberspace; (8) the 1718 File was never found or downloaded from computers of known bad actors (*e.g.,* identity thieves); (9) the 1718 File was never publicly available; (10) LabMD did not leak the 1718 File; (11) Tiversa leaked the 1718 File; (12) Tiversa partnered with Dartmouth College to search for and take the 1718 File as part of a federally-funded study by Dartmouth; (13) Tiversa, through its attorney Jim Cook, threatened to turn LabMD in to the FTC if LabMD did not hire Tiversa; (14) Tiversa gave the FTC a list of approximately 100 companies Tiversa claimed leaked confidential files on the internet (some or all of those companies had rejected Tiversa's solicitations of business); (15) Tiversa attorney Eric Kline created The Privacy Institute at the suggestion of FTC investigator Ruth Yodaiken as a means for Tiversa to funnel documents to the FTC in secret; (16) Neither Tiversa nor The Privacy Institute ever produced anything to the FTC under "threat;" (17) Tiversa's reward for turning companies in to the FTC was its receipt of more business due, for example, to prospective customers' fear of FTC investigations and prosecutions; (18) The FTC helped Tiversa

secure more business by giving it advance notice of the companies to whom it was sending inquiry letters; (19) Tiversa's documentary evidence that Tiversa located and downloaded the 1718 File from a computer in San Diego, California (*e.g.*, CX0019, Chopra Affidavit) was fabricated; (20) Tiversa's documentary evidence of spread of the 1718 File (*e.g.*, CX0019, Chopra Affidavit) was fabricated; and (21) Boback's testimony regarding the alleged spread of the 1718 File was false.

71.     Each of the false allegations in the amended Federal Defamation Action, which also constituted defamation per se pursuant to 42 Pa.C.S. §§ 8353, injured the reputations of Daugherty and LabMD and chilled the sales of *The Devil Inside the Beltway*.

72.     The amended Federal Defamation Action caused Daugherty to suffer emotional distress.

73.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the allegations in the amended complaint in the Federal Defamation Action were false.

74.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the claims in the amended complaint in the Federal Defamation Action were invalid.

75.      Tiversa, Boback, Reed Smith and Shaw had no probable cause for the amended complaint in the Federal Defamation Action.

76.     Neither Tiversa, Boback, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in the amended complaint in the Federal Defamation Action were based.

77.     Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of the amended complaint in the Federal Defamation Action was not intended to merely harass or maliciously injure Daugherty and LabMD.

78.     Neither Tiversa nor Boback reasonably believed in the existence of facts upon which the claims in the amended complaint in the Federal Defamation Action were based due to reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

79.     In late January or early February, Boback called a medical facility that had treated Wallace, fraudulently represented himself to be Wallace's lawyer and convinced the medical facility to send Wallace's confidential medical records to Boback.  Boback and Tiversa later gave those medical records to others and used the records to intimidate and harass Wallace.

80.     On January 30, 2014, LabMD served a *subpoena ad testificandum* on Tiversa employee Richard E. Wallace for a deposition to be taken in Pittsburgh in the enforcement action.

81.     On February 26, 2014, Shaw informed LabMD's counsel that Wallace was "no longer available" to be deposed due to an "unexpected medical issue."

82.     On April 2 and April 3, 2014, Daugherty received telephone calls from Wallace who reported the following to Daugherty:

–   Wallace's employment at Tiversa was terminated on April 1, 2014, after Wallace refused to comply with Boback's demand that Wallace lie under oath to the federal government.

–   Boback lied about where the 1718 File was found.

–   Tiversa never found the 1718 File anywhere other than on a LabMD computer in Atlanta, Georgia.

–   Tiversa took the 1718 File directly from a LabMD computer.

29

83.     Tiversa and Boback and, on information and belief, Reed Smith and Shaw hired and directed CSI Investigations, Inc. and Sam Rosenberg of InPax, private investigators, to investigate, intimidate, harass, photograph, videotape, track, trail, antagonize, surveil and leave threatening notes for Wallace and his family.   In addition, Boback followed Wallace down a highway and watched Wallace's children at their bus stop, all for the purpose of intimidating Wallace and coercing him not to testify and/or not to tell the truth in the Federal and State Defamation Actions and the FTC's enforcement action.

84.     In early June 2014, at Boback's direction, Tiversa employee Keith Tagliaferri prepared a report containing false information regarding the alleged spread of the 1718 File (the "Tagliaferri Report").   Tagliaferri falsely reported that Tiversa had found and downloaded the 1718 File from computers located in Atlanta, Georgia; San Diego, California; Chicago, Illinois; San Jose, Costa Rica; London, England; Alpharetta, Georgia; and Nashville, Tennessee.

85.     The Tagliaferri Report, a true and correct copy of which is attached hereto as Exhibit F, contains the following false information:

> The 6 additional IP addresses were detected in possession of the 1,718 page "Insurance Aging" Report (insuranceaging_6.05.071.pdf) on various dates within the disclosure date ranges referenced above.

> These 6 IP addresses possess additional files including federal tax returns relating to numerous individuals, credit reports. credit card and bank account statements, passports. Usernames and passwords to online accounts, medical patient data, lists of credit card numbers, social security numbers, instructions on how to hack and steal passwords etc. Tiversa classifies these 6 additional IP addresses as Information Concentrators.

> Throughout our extensive P2P research, Tiversa continues to see individuals harvesting a large number of files containing confidential and sensitive data. Tiversa calls these individuals "Information Concentrators" and in most cases, they are suspicious in nature. These individuals utilize P2P file sharing networks to search for sensitive and confidential data (i.e., Credit Card #'s, Passwords, Account#'s, SSN, PII, Payroll Information, HR, Medical, Financial, IT Information etc). Information Concentrators gather this information and could potentially use it for malicious purposes.

86.     It was common knowledge within Tiversa that Tagliaferri was writing a false report for Tiversa to use in its battles with Daugherty and LabMD.

87.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the Tagliaferri Report contained false data.

88.     The U.S. House of Representatives Oversight and Government Reform Committee (the "OGR Committee") initiated an investigation into the business practices of Tiversa and its relationship with the Federal Trade Commission in or around August 2014.

89.     Tiversa produced the Tagliaferri Report to Congress thereafter.

90.     On or before October 2, 2014, Tiversa, Boback, Reed Smith and Shaw learned that LabMD was seeking immunity for Wallace to testify before Congress and in the enforcement action.

91.     Tiversa, Boback, Reed Smith and Shaw responded to the immunity request by filing a "Notice of Information" in the enforcement action on October 14, 2014.  The Notice of Information included fabricated emails allegedly authored by Wallace in November 2012.  The fraudulent emails purported to support the fraudulent data in the Tagliaferri Report.

92.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the emails in the Notice of Information were fabricated.

93.     On October 31, 2014, Tiversa, Boback, Reed Smith and Shaw filed a verified complaint in the State Defamation Action, a true and correct copy of which is attached hereto, marked as Exhibit G and incorporated by reference herein.   Tiversa, Boback, Reed Smith and Shaw increased the counts from four to seven, added two more parties and made the following false allegations:

> [From the preliminary statement] Namely, LabMD and Mr. Daugherty have published a book containing defamatory statements which were they know were false. CoA has taken

on LabMD's and Mr. Daugherty's cause and used those knowingly false and defamatory statements to harm Tiversa for the benefit of LabMD.

\* \* \*

Lastly, Mr. Wallace (with the assistance of LabMD and CoA) has spread lies and made misleading statements, and as a result, he has eschewed his contractual obligations and disparaged Tiversa.

15. The File, while believed to be created and stored on a LabMD computer, was available to Tiversa and others only because a LabMD computer had downloaded Lime Wire, a P2P sharing application. By downloading Lime Wire, LabMD allowed access to the File via the P2P network making it publically available.

16. The File was downloaded by Tiversa from various IP addresses. The File was available on these networks because LabMD downloaded Lime Wire on one of its computers making the File available to the public.

22. Armed with this knowledge, the FTC visited Tiversa, and attempted to obtain any and all non-redacted files in Tiversa's possession which, among other things, contained Social Security Numbers.

23. Tiversa refused to produce anything directly to the FTC. Instead, Tiversa elected to create an entity called the Privacy Institute and the FTC served that entity with a Civil Investigative Demand pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1 (the "CID"). The CID did not specifically identify Defendants.

24. In August of 2009 the Privacy Institute responded to the CID and provided responses including a spreadsheet that contained, inter alia, information related to companies that had inadvertently file-shared documents containing unique personal identifying information ("PII"), including the Data Owner, File Title(s), Unique Individuals' PU, IP Address, and date.

30. In his video "trailer" for the Book, available on, inter alia, Mr. Daugherty's personal website, Mr. Daugherty highlights his position as LabMD's President and CEO and Mr. Daugherty alleges that Tiversa is part of a "Government Funded Data Mining & Surveillance" scheme that engages in "Psychological Warfare" and helps to assist in "Abusive Government Shakedown[s]." See www.michaeljdaugherty.com. More specifically, Mr. Daugherty alleges Tiversa is conducting "300 Million Searches per day" for "Homeland Security" and the "Federal Trade Commission." See id.

31. Mr. Daugherty made a host of additional statements prior to the Book's publication:

  • Mr. Daugherty claims that Tiversa "downloaded" the File "and would not answer our questions unless we hired them, kicked the file over to the feds, and then the

Federal Trade Commission began overwhelming our small business, a cancer detection center, with their beltway tactics." See id.

• See also Video of Heritage Foundation Blogger Brief (stating that Tiversa and Mr. Boback wouldn't "give [LabMD] any information unless we hired him which I wouldn't do" that "we, to this day, don't feel like our file ever got out" and that "we don't even believe that there was a breach");

• www.michaeljdaugherty.com/2012/09/16/the-ftc-is-suing-me/ (alleging that Tiversa "took our file without authorization");

• Amy Wenk, Atlanta Medical Lab Facing Off Against FTC, Atlanta Business Chronicle, September 7, 2012, p. 3A, 22A ("'This is a property theft case,' Daugherty said. '[Tiversa] came in and affected our network'");

• www.indiegogo.com/projects/the-devil-inside-the-beltway/ (stating, on a website created by Mr. Daugherty, that "[w]hat began with the unauthorized but government-funded procurement of medical data for 9000+ patients from his medical laboratory turned into a government supported, financially draining, extortion attempt");

• Interview by Accuracy in Media with Michael J. Daugherty, available at www.michaeljdaugherty.com/media (stating that Tiversa "did not find [the File] out on cyberspace", that "the [F]ile was taken by a government funded study and a group from Dartmouth and a company named Tiversa", and that Tiversa "took" LabMD's property);

• Interview by Tea Party News Network with Michael J. Daugherty, available at http://www.youtube.com/watch?v=-x6UDWwdevw (stating that "Homeland Security paid [Tiversa] to surveil 4.5 million workstations around the world" and that "Homeland Security gave $24 million dollars to Dartmouth and Tiversa to go out and surveil the web");

• Interview by The Mike Huckabee Show, available at http://www.mediafire.com/Iisten/ anqxg 16hdbay4 hg/Michael+ Daugherty+ 9+23+ 1 3.mp3 (stating, in response to the assertion "this sounds like a blackmail case" that "I can say we felt like something really bad was going on" and that "no one was willing to help us or educate us unless we paid them", that "we couldn't get any more information from [Tiversa] unless we were willing to sign a services agreement which we considered it was nefarious", that "Homeland Security gave a $24 million dollar grant to Dartmouth who worked with Tiversa to go and a they use the word 'monitor' for files", that "the left hand took it and the right hand's slapping me", that "the next thing you know the FTC has [the File] and they're investigating me. It was quite clubby", responding to the question "somebody is able to infiltrate into your system, and I guess like a vacuum cleaner suck everything out of it, and then make copies of all those records; is that essentially what happened?" with the response of "Yea,

33

we lost stuff', and responding to the statement that "I might leave a lawnmower in my yard, so it could be accessible, but ... nobody just has a right to come by and take it home with them" with the assertion "right, it's shocking").

32. Mr. Daugherty further alleges that "the feds" are "paying contractors to surveil for medical files[.]" See Trailer for The Devil Inside the Beltway.

34. Although they are far too numerous to list in their entirety, the Book, at 493 pages, offers a host of defamatory statements:

  • See e.g., Book, p. 282 ( calling Mr. Boback "a con artist"),

  • p. 419 ("LabMD got entrapped"),

  • p. 405 ("How about entrapment?"),

  • p. 89 (stating that Tiversa was part of "the one-two entrapment strategy"),

  • p. 359 ("It wasn't until LabMD declined to engage Tiversa's 'security services' ... and then sued Tiversa ... that the FTC was compelled to issue the present CID. This unusual timing only serves to incentivize organizations to pay off Tiversa (as non-payment appears to coincide with the opening of an FTC investigation)"),

  • p. 310 (discussing "Tiversa's 'pay or no play' program"),

  • p. 279 (describing a conversation in which "Bloomberg" described Tiversa's business model as a "shakedown", and that Tiversa engaged in "[ q]uestionable practices, to say the least"),

  • p. 375 ("Tiversa regularly contacted companies whose file they had taken in order to solicit business"),

  • p. 309 (stating that Tiversa and Mr. Boback were attempting "to exploit a medical facility"),

  • p. 325 ( describing the parties' interactions as "a theft case"),

  • id. ("Isn't this nothing more than a flat-out case of theft?"),

  • p. 111 (stating that Mr. Daugherty and LabMD "had used the terms 'hustler' and 'oily salesman' to describe" Mr. Boback),

  • p. 276 ("You sneaky snake. How dare you, Tiversa, hold up our property as a means to scare others so you can close more business"),

  • id. ( describing Tiversa as "Nasty"),

• p. 355 (calling Tiversa "invaders" who had perpetrated an "injustice"),

• p. 53 ("I really hate it that Boback turned this over to the FTC. I feel like we're being punished for not hiring Tiversa ..... Was it just me, or did something stink?"),

• p. 68 ("[A] security firm swip[ed] our stuff and then tum[ ed] it in to the FTC"),

• p. 33 ("How much do you want to bet they're throwing us under the bus because I wouldn't hire them?"),

• id. ("Tiversa-a company that had just become even more soulless to me, if that was possible"),

• id. ("I know I wouldn't sell my soul to this particular devil no matter what the consequence"),

• p. 51 ("We know who took the goods"),

• p. 109 ("I bet he threw us under the bus because we wouldn't sign his services agreement! .... That hypocrite showed our file to Congress! He has the nerve to try to get us to pay him $40,000 and then sits in front of those representatives like he's a saint?"),

• p. 119 ("Tiversa collected (a.k.a. took with surveillance software) more than 3,000 files"),

• p. 276 ("Sounds like surveillance to me. Hey Tiversa ... who is watching you watching us?"),

• p. 325 ("Tiversa should have been aware of the confidential nature of the information when they opened a port and entered our workstation and downloaded our file"),

• p. 326 (comparing the United States government and Tiversa to "Queen Elizabeth I sending Walter Raleigh to loot Spanish ships"),

• id. ( claiming that Tiversa "use[ d] software to remotely open our door locks"),

• p. 374 (stating that Tiversa "t[oo]k[] someone's property"),

• p. 390 (stating that Tiversa was "snooping on the internet for other people's property or sensitive private data").

35. Mr. Daugherty not only made statements such as these before the publication of the Book, and in the Book itself, but has continued to make such statements since the Book's publication:

• See, e.g., Author Mike Daugherty Discusses Government Overreach, available at http://www.bloomberg.com/news/2013-l 0-29/author-mikedaughterty- discusses-government-overreach-audio-.html (stating, regarding the Defendants' interactions with Plaintiffs, that "something was wrong", "it was creepy", there was a "big creepy, big brother feel", that Mr. Boback "would not give us any information unless we wanted to hire him for his services" and that Defendants "would not tell us anything unless we hired them and we didn't feel that was even a proper way to start a relationship", and were, along with Dartmouth "recipients of $24 million dollars from Homeland Security to go out and do this research, and do this paper");

• Interview by RedState.com with Michael J. Daugherty, available at www.redstate.com/2013/10/30/the-devil-inside-the-beltway/ (stating that "our file was taken and retrieved", that "information [from Tiversa] stopped unless we would retain them", and, in response to the question "how is that not extortion?", responding "I guess we're going to ask the judge that");

• Interview by Taking Stock of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/11/15/discussingthepitfallsoffederalag encies/ (stating that "when ... we wouldn't pay the company that actually took it, they got turned over to the feds" and that Tiversa was part of a "Homeland Security sponsored project");

• Interview by The Edington Post of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/12/16 (available in the section entitled "Michael Interviewed by Edington Post") (stating that Tiversa "went out and scoured the web", "wouldn't tell us anything unless we had hired them", had its lawyers "call[ and say], in a very accusatory tone of voice, you know, your standards aren't right, blah, blah, blah, we're giving this over to the Federal Trade Commission", and is, with the United States government, "snooping over everybody", and further stating that "so much of this was like a movie ... Wesley Clark on their board, and then I found out that Obama's head of cybersecurity, Howard Schmidt, is on their advisory board", "you've got academia, private business, the federal government, all intruding", "Homeland Security was paying Tiversa to go out ... , and they were monitoring thousands of work stations around the world", and also noting, in response to the question of "where can people get the Book?" that it was available at "thedevilinsidethebeltway.com", a URL which redirects the user to Mr. Daugherty's personal website);

• William Jackson, Patient Data on Filesharing Service Provokes Legal Trouble, available at www.informationweek.com/govemment/cybersecurity/patient-data-on- filesharing-service-provokes-legal-trouble/d/d-id/1113235 (quoting Mr. Daugherty as stating that "[t]his smelled of extortion");

36

• Interview by Joy Tiz of Michael J. Daugherty, available at http://www.blogtalkradio.corn/joytiz/2014/0 1 /02/the-devil-inside-thebeltway/ (stating that Tiversa had "a really big creepy Big Brother feeling" and in response to the statement "so, basically extortion", responding "well yeah");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/michael-j-daugherty-april-9-2014/ ( describing Tiversa as "real shady" and "anything but professional");

• Interview by Edward Woodson of Michael J. Daugherty, available at http:// ed wardwoodson. com/listen/3-1 7-14 ( stating that Tiversa "wouldn't stop pursuing us" and remarking as to the File that they "never found it ourselves out in cyberspace" and Tiversa "turned it over to the feds");

• Interview by Jack Burkman of Michael J. Daugherty, available at http://www.radioamerica.org/POD _ burkman.htm/ (responding to the question "so that's almost like extortion?" with "that's about it, yeah");

• Interview by Martha Zoller with Michael J. Daugherty, available at http://zpolitics.com/the-devil-inside-the-beltway/ (naming Tiversa as the Pennsylvania company that contacted him about the File, stating that they "[could not] find the file out in cyberspace," responding to the question "So this file was stolen from you?" with "Yeah" and stating that he was "going to start a book tour across country");

• Interview by Book Bliss of Michael J. Daugherty, available at http://bookbliss.com/2013/06/19/the-devil-inside-the-beltway/ (stating that "the government funded Dartmouth and this company Tiversa to go out and conduct a study, and to go surveil peer to peer networks");

• United States House of Representatives, Committee on Oversight and Government Reform, 7 /24/14 ("Mr. Boback told me that Tiversa had found LabMD patient data on the Internet, but refused to tell us more unless we paid and retained them"; describing Tiversa as a "protection racket"; alleging that Tiversa was "trying to scare us"; discussing "the so called 'breach'" stating that Mr. Boback "made good on his threat to us" and disregarded "the dignity of cancer patients"; "Tiversa did NOT get this file as portrayed in the Dartmouth study and Tiversa and Dartmouth knew it"; discussing "Tiversa's creation of the FTC's investigation after LabMD refused to retain Tiversa");

• Interview by Frank Schneider of Michael J. Daugherty, available at http://www.iheart.com/show/Rod-Arquette-Show/episodes/ (noting, without solicitation, that Tiversa was based in Pittsburgh, Pennsylvania; responding to the claim that Tiversa had said "hey we've got a bunch of your files that we got into your system and got a hold of' with the allegation that "they were

very sneaky and wouldn't say anything unless we paid them for more information"; stating that Tiversa is "essentially a private company that's collected 13 million files from all of us"; agreeing with the statement that Tiversa "in a clandestine manner, in a secret manner, sneaks inside of servers of small companies and big companies, all over the country and yanks files of confidential information out of those servers and gathers those together"; stating that the file had been "clandestinely possessed"; discussing the Privacy Institute, and stating that "the FTC thought of I and that Tiversa built it and that's how they funneled these files from Tiversa to the FTC");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/october-7-2014/ (noting, unsolicited, that Tiversa was based in Pittsburgh, Pennsylvania; alleging that Tiversa is "working with the feds"; "He would say nothing unless we paid him. And then it got more aggressive"; "And he said he was going to turn us over to the feds. And he did turn us over to the feds"; discussing files, and stating that Tiversa "went and took them and they keep them");

• Interview by Dana Roe of Michael J. Daugherty, available at http://danaroc.com/inspiring_ 020314michaeldaughtery.html (noting, unsolicited, that Tiversa was based in Pennsylvania; stating that Tiversa engages in "all of this macho power talk ... about how large and in charge they are on monitoring and finding all of these files"; stating that Mr. Boback "wouldn't tell us anything unless we hired him and that's what was bothering everybody"; stating that LabMD "was not leaking files"; stating that Tiversa told LabMD "we are going to give this to the Federal Trade Commission"; stating that Tiversa "threatened to go to the Feds");

• Interview by Tom Barnard of Michael J. Daugherty, available at http://www.tombarnardpodcast.com/ (noting, unsolicited, that Tiversa was based in Pittsburgh; "he wouldn't tell [me] anything unless we paid him"; stating that LabMD was "hacked"; stating that "a whistleblower outside Tiversa came up, was manned up, stood up and said 'I need immunity cause a whole lot  of bad stuff is going down over here'"; stating that "agencies were getting lied to, companies were getting lied to"; stating that "Tiversa was less than truthful to the Feds, how they got it has been alleged to be a lie, where they found it is alleged to be a lie");

• Interview by Cynthia Dillion of Michael J. Daugherty, available at http://wsradio.com/030614-live-from-cpac-cyber-security-michael-daugherty-youth-conservative-outreach-for-the-rnc-raffi-williams/ (stating that Tiversa "wouldn't answer any questions other than they had it and prove they had it unless we paid them"; "our property was turned over by them to the ... Federal Trade Commission");

• Interview by Marianne Kolbasuk McGee of Michael J. Daugherty, available at http://www.healthcareinfosecurity.com/interviews/labmd-ceodescribes- his-beefs-ftc-i-2184 ("We could not get any answers out of them as to how, where or what unless we hired them, which created a huge issue of distrust");

• 9/10/13 Panelist Briefing of Tech Freedom and Cause of Action, available at http://www.youtube.com/watch?v=MqfcDmBJgvc (stating that "no answers would come back unless we signed a services agreement"; stating that Tiversa's communication "gave us a real big brother feel, like who is watching us, here?"; responding to the question "and you said no and you fixed the problem yourself, and then they turned you over to the FTC" with the response "correct"; "we know someone came in and took" the File);

• Interview by Cindy Graves of Michael J. Daugherty, available at http://www.wbobradio.com/2014/10/0l/cindy-graves-show-hr-2-10114/    (stating that "he wouldn't tell us unless we paid him", that "he wouldn't give us any information unless we hired him ... ", that "it just was so creepy from the beginning, so Big Brother, ... ", that "he turns it over to the Feds", that "these guys were working - Homeland Security gave $24 million to Dartmouth and they use this company's technology .... And they were monitoring and taking possession of all these files ... ", that the FTC was "sitting with this company that's gathering the stuff. It's a private enterprise that's ... building ... this whole mountain of military information, tax records, medical records. They're taking possession of it", responding to the statement that "it looks like the government ... employed them to hack into your system and then say, ah hah! I hacked into your system. Now you need to pay me to - to plug that leak" with the statement "Right, right", stating that "[t]hey took my stuff");

• Interview by Stacy Harp of Michael J. Daugherty, available at http://www.blogtalkradio.com/acmedia/2014/10/01  /the-devil-inside-thebeltway-the-shocking-expose-of-the-govts-surveillance (stating that "he was setting us up. And he wouldn't tell us anything about how he got it unless we hired him", that "that was very creepy ....... it was a Big Brother type feel. It - it felt like a shakedown. It felt extortionistic. It did. If felt like this guy's not going to give us anything unless we paid him and hired him", stating that "here was a private company that's working with a funded study and a major university looking and monitoring us and downloading 13 million workstations - files ..... why is it theirs to take and hold and keep and not tell us what they've done with it or how they got it?", responding to the statement that "I'm hoping that this investigation, if there are any ties between Tiversa and the FTC that you know, there's a scratch each other's back kind of arrangement where people who don't buy our services, you know, you go after them, sue them and we'll take a cut, you know, we'll divvy up the loot. If such a thing is going on it wouldn't surprise me. I hope that that you know, hope that comes out as part of this investigation" with the response that "Oh well, it's going on all right and I can talk about that").

36. In essence, Mr. Daugherty has echoed, in many different mediums, the main crux of the Book: that Tiversa and Mr. Boback illegally accessed and stole LabMD's files, and then extorted LabMD in an attempt to obtain business. When LabMD refused, according to Mr. Daugherty, Tiversa and Mr. Boback sent the files to the FTC, to begin an investigation into Lab MD. Thus, Mr. Daugherty and LabMD have accused Tiversa and Mr. Boback of being

criminals, who have engaged in crimes involving crimen falsi, by being thieves, extortionists, con artists and parties to a government conspiracy somehow intended to defraud Mr. Daugherty and LabMD.

39. As described in Paragraphs 30-36, LabMD and Mr. Daugherty disregarded the November 8, 2012 letter entirely by making statements, and publishing the Book. Those statements, and the Book, therefore, were made with knowledge of their falsehood or reckless disregard for the fact that they were false.

40. Moreover, upon information and belief- both prior to and after publication of the Book - Mr. Daugherty became aware that LabMD files made available on a peer to peer file sharing network are "public" because of LabMD's downloading of Lime Wire.

41. Upon information and belief, in May 2013, Mr. Daugherty was informed that the allegations he had levied against Plaintiffs were false and betrayed a general misunderstanding of P2P technology. Mr. Daugherty elected to willfully ignore those warnings.

43. LabMD and Mr. Daugherty have willfully, intentionally, wantonly, maliciously, and repeatedly spread their allegations, targeted to Pennsylvania, regarding Pennsylvania residents, and with knowledge that those allegations would cause harm to those Pennsylvania residents in this Commonwealth.

44. LabMD's and Mr. Daugherty's allegations regarding Mr. Boback's and Tiversa's conduct are false and actionable.

50. Specifically, prior to Mr. Wallace's final disposition of the Tiversa stock which occurred on May 9, 2014, Mr. Wallace was allegedly in contact with the House Committee on Oversight and Government Reform in an effort to provide false and disparaging information regarding Tiversa. Upon information and belief, Mr. Wallace had also corresponded with LabMD and CoA to discuss providing false and disparaging information regarding Tiversa.

57. Plaintiffs are not aware of precisely what Mr. Wallace told CoA regarding his time at Tiversa, because neither CoA nor Mr. Wallace have provided Tiversa with that information. However, recent filings in the FTC Action indicate Mr. Wallace has told CoA that, while working for Tiversa and upon the request of an FTC attorney, Mr. Wallace fabricated information regarding the discovery and dissemination of the File.

58. Mr. Wallace's statements are demonstrably false.

59. CoA and LabMD have knowingly ignored the falsehoods provided to them by Mr. Wallace in exchange for conspiring to act maliciously against Plaintiffs.

60. Any and all allegations of Mr. Wallace regarding nefarious activity of Tiversa

during Mr. Wallace's tenure as an employee are false. Any illegal or improper actions taken by Mr. Wallace while an employee of Tiversa, if any, were taken without Tiversa's knowledge, and were outside the scope of Mr. Wallace's employment with Tiversa.

63. Upon information and belief, the Committee's investigation was triggered by CoA providing the Committee with the false allegations made by Mr. Wallace.

94. There is no conditionally privileged occasion which exists to allow Mr. Daugherty or LabMD to have made the defamatory statements. In the alternative, Mr. Daugherty and LabMD, as demonstrated above, have abused a conditionally privileged occasion to the extent any exist, which Plaintiffs deny.

95. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and Lab MD have acted with actual malice.

96., 103., 107. And 110. Mr. Daugherty's and LabMD's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on Mr. Daugherty and LabMD's part. Mr. Daugherty and LabMD had an appreciation for, and consciously disregarded, the risk of harm to Plaintiffs which their conduct entailed.

102. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and LabMD have acted with actual malice.

105. The statements made by Mr. Daugherty and LabMD, discussed in Paragraphs 30- 36, are false.

106. Mr. Daugherty and LabMD had no privilege to make these statements.

109. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and LabMD have acted with actual malice.

115. Upon information and belief the Committee's investigation into Tiversa was triggered by CoA's provision of Mr. Wallace's false statements regarding Tiversa.

123. The Defendants LabMD, Mr. Daugherty, CoA, and Mr. Wallace combined and agreed to - acting with the intent to injure the Plaintiffs through an unlawful act or through an otherwise lawful act but by unlawful means, and without justification to do so - and took actions in furtherance of their agreement to cause harm to Tiversa by, among other things and without limitation, interfering with its existing contractual relations.

94.    The allegations set forth above are false because (1) Tiversa illegally hacked into

and took the 1718 File from a LabMD computer in Atlanta, Georgia on February 25, 2008, without

LabMD's knowledge, authority or permission; (2) Tiversa illegally used law enforcement surveillance software owned by the federal government to search for, access and download the 1718 File from LabMD's computer; (3) the taking of the 1718 File violated several state and federal criminal statutes including, without limitation, 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information); (4) Tiversa never located or downloaded the 1718 File from any computer other than LabMD's computer in Atlanta, Georgia; (5) Tiversa's internal documents establish that Tiversa took the 1718 File *directly* and *solely* from a LabMD computer in Atlanta, Georgia; (6) Tiversa never located or downloaded the 1718 File from a computer in San Diego, California; (7) the 1718 File never "spread" anywhere in cyberspace; (8) the 1718 File was never found or downloaded from computers of known bad actors (*e.g.,* identity thieves); (9) the 1718 File was never publicly available; (10) LabMD did not leak the 1718 File; (11) Tiversa leaked the 1718 File; (12) Tiversa partnered with Dartmouth College to search for and take the 1718 File as part of a federally-funded study by Dartmouth; (13) Tiversa, through its attorney Jim Cook, threatened to turn LabMD in to the FTC if LabMD did not hire Tiversa; (14) Tiversa gave the FTC a list of approximately 100 companies Tiversa claimed leaked confidential files on the internet (some or all of those companies had rejected Tiversa's solicitations of business); (15) Tiversa attorney Eric Kline created The Privacy Institute at the suggestion of FTC investigator Ruth Yodaiken as a means for Tiversa to funnel documents to the FTC in secret; (16) Neither Tiversa nor The Privacy Institute ever produced anything to the FTC under "threat;" (17) Tiversa's reward for turning companies in to the FTC was its receipt of more business due, for example, to prospective customers' fear of FTC investigations and prosecutions; (18) The FTC helped Tiversa secure more business by giving it advance notice of the companies to whom it was sending inquiry letters; (19) Tiversa's documentary evidence that Tiversa located and downloaded the 1718 File

from a computer in San Diego, California (*e.g.*, CX0019, Chopra Affidavit) was fabricated; (20) Tiversa's documentary evidence of spread of the 1718 File (*e.g.*, CX0019, Chopra Affidavit) was fabricated; and (21) Boback's testimony regarding the alleged spread of the 1718 File was false.

95.     Each of the false allegations in the complaint in the State Defamation Action, which also constituted defamation per se pursuant to 42 Pa.C.S. §§ 8353, injured the reputations of Daugherty and LabMD and chilled the sales of *The Devil Inside the Beltway*.

96.     The State Defamation Action caused Daugherty to suffer emotional distress.

97.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the allegations above were false.

98.     Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the claims in the complaint in the State Defamation Action were invalid.

99.      Tiversa, Boback, Reed Smith and Shaw had no probable cause for the complaint in the State Defamation Action.

100.    Tiversa, Boback, Reed Smith and Shaw joined former Tiversa employee and whistleblower Richard E. Wallace and LabMD's pro bono law firm (Cause of Action Institute) in the State Defamation Action for purposes of, *inter alia*, (1) maliciously prosecuting Daugherty and LabMD together with Wallace and Cause of Action; (2) draining Wallace and LabMD's law firm of their limited financial resources; (3) intimidating and retaliating against Wallace for blowing the whistle on Tiversa; and (4) disseminating Tiversa's lies about finding the 1718 File on the computers of known bad actors.

43

101.    Neither Tiversa, Boback, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in the complaint in the State Defamation Action were based.

102.    Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of the State Defamation Action was not intended to merely harass or maliciously injure Daugherty and LabMD.

103.    Neither Tiversa nor Boback reasonably believed in the existence of facts upon which the claims in the complaint in the State Defamation Action were based due to reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

104.    On November 4, 2014, on the eve of discovery, Tiversa, Boback, Reed Smith and Shaw moved to voluntarily dismiss the Federal Defamation Action without prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.

105.    On November 14, 2014, the U.S. Attorney General issued Wallace a grant of immunity pursuant to 18 U.S.C. § 6002.

106.    On March 9, 2015, Tiversa, Boback, Reed Smith and Shaw filed an amended verified complaint in the State Defamation Action, a true and correct copy of which is attached hereto, marked as Exhibit H and incorporated by reference herein.   Despite the September 5, 2013 Email and the CIGNA Report, Tiversa, Boback, Reed Smith and Shaw made the following false allegations:

> [From the preliminary statement] Tiversa and Mr. Boback bring this action to remedy
> Defendants' past and continuing attempts to harm them through extensive misconduct and
> false and defamatory statements they have made with full knowledge that their conduct
> was egregious, improper, and wrong.

44

When faced with the consequences of their failures to properly protect the confidential information of their patients - a fact they have now admitted in adjudicative filings – LabMD and Mr. Daugherty could have accepted responsibility, remedied those failures, and continued doing business. Instead, unable to grasp the concept of their own fallibility, LabMD and Mr. Daugherty sought revenge upon the parties who had revealed their mis-steps, and published a book containing defamatory statements about Tiversa and Mr. Boback which LabMD and Mr. Daugherty knew were false.

In an attempt to justify the defamatory statements, Mr. Wallace, with the assistance of Mr. Daugherty, LabMD, and CoA, spread lies and made misleading statements about Tiversa and Mr. Boback, and as a result, he has eschewed his contractual obligations. As a product of all of this behavior, Tiversa and Mr. Boback seek damages - both compensatory and punitive - arising from the Defendants' egregious, improper, and outrageous conduct.

LabMD and Mr. Daugherty have compounded their original mistake - a failure to protect confidential information - by, with the help of Mr. Wallace and CoA, committing yet another blunder: the disparagement of Tiversa and Mr. Boback, in the name of revenge for imagined, delusional outrages. This cannot stand.

17. The File was downloaded by Tiversa from various IP addresses. The File was available on these networks because LabMD downloaded Lime Wire on one of its computers making the File available to the public. See id. In October of 2012, the Sacramento, California Police Department found more than 35 LabMD Day Sheets, and approximately 10 copied checks made payable to LabMD in a house in Sacramento, California. See id.

23. Armed with this knowledge, the FTC visited Tiversa, and attempted to obtain any and all non-redacted files in Tiversa's possession, which, among other things, contained Social Security Numbers.

24. Tiversa refused to produce anything directly to the FTC. Instead, Tiversa elected to create an entity called the Privacy Institute and the FTC served that entity with a Civil Investigative Demand pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-l (the "CID"). The CID did not specifically identify Defendants.

25. In August of 2009 the Privacy Institute responded to the CID and provided responses including a spreadsheet that contained, inter alia, information related to companies that had file-shared documents containing unique personal identifying information ("PII"), including the Data Owner, File Title(s), Unique Individuals' PII, IP Address, and date.

30. Mr. Daugherty and LabMD intentionally made false and defamatory statements regarding the Plaintiffs before, in, and after the publication of the Book.

31. In his video "trailer" for the Book, available on, inter alia, Mr. Daugherty's personal website, Mr. Daugherty highlights his position as LabMD's President and CEO and Mr. Daugherty alleges that Tiversa is part of a "Government Funded Data Mining & Surveillance" scheme that engages in "Psychological Warfare" and helps to assist in "Abusive Government Shakedown[s]." See www.michaeljdaugherty.com. More

specifically, Mr. Daugherty alleges Tiversa is conducting "300 Million Searches per day" for "Homeland Security" and the "Federal Trade Commission." See id.

32. Mr. Daugherty made a host of additional statements prior to the Book's publication:

> • Mr. Daugherty claims that Tiversa "downloaded" the File "and would not answer our questions unless we hired them, kicked the file over to the feds, and then the Federal Trade Commission began overwhelming our small business, a cancer detection center, with their beltway tactics." See id.

> • See also Video of Heritage Foundation Blogger Brief (stating that Tiversa and Mr. Boback wouldn't "give [LabMD] any information unless we hired him which I wouldn't do" that "we, to this day, don't feel like our file ever got out" and that "we don't even believe that there was a breach");

> • www.michaeljdaugherty.com/2012/09/16/the-ftc-is-suing-me/ (alleging that Tiversa "took our file without authorization");

> • Amy Wenk, Atlanta Medical Lab Facing Off Against FTC, Atlanta Business Chronicle, September 7, 2012, p. 3A, 22A ("'This is a property theft case,' Daugherty said. '[Tiversa] came in and affected our network'");

> • www.indiegogo.com/projects/the-devil-inside-the-beltway/ (stating, on a website created by Mr. Daugherty, that "[w]hat began with the unauthorized but government-funded procurement of medical data for 9000+ patients from his medical laboratory turned into a government supported, financially draining, extortion attempt");

> • Interview by Accuracy in Media with Michael J. Daugherty, available at www.michaeljdaugherty.com/media (stating that Tiversa "did not find [the File] out on cyberspace", that "the [F]ile was taken by a government funded study and a group from Dartmouth and a company named Tiversa", and that Tiversa "took" LabMD's property);

> • Interview by Tea Party News Network with Michael J. Daugherty, available at http://www.youtube.com/watch?v=-x6UDWwdevw (stating that "Homeland Security paid [Tiversa] to surveil 4.5 million workstations around the world" and that "Homeland Security gave $24 million dollars to Dartmouth and Tiversa to go out and surveil the web");

> • Interview by The Mike Huckabee Show, available at http://www.mediafire.com/I isten/ anqxg 16hdbay4 hg/Michael+ Daugherty+ 9+23+ 1 3.mp3 (stating, in response to the assertion "this sounds like a blackmail case" that "I can say we felt like something really bad was going on" and that "no one was willing to help us or educate us unless we paid them", that "we couldn't get any more information from [Tiversa] unless we were willing to sign a services agreement which we considered

it was nefarious", that "Homeland Security gave a $24 million dollar grant to Dartmouth who worked with Tiversa to go and a they use the word 'monitor' for files", that "the left hand took it and the right hand's slapping me", that "the next thing you know the FTC has [the File] and they're investigating me. It was quite clubby", responding to the question "somebody is able to infiltrate into your system, and I guess like a vacuum cleaner suck everything out of it, and then make copies of all those records; is that essentially what happened?" with the response of "Yea, we lost stuff, and responding to the statement that "I might leave a lawnmower in my yard, so it could be accessible, but ... nobody just has a right to come by and take it home with them" with the assertion "right, it's shocking").

33. Mr. Daugherty further alleges that "the feds" are "paying contractors to surveil for medical files[.]" See Trailer for The Devil Inside the Beltway.

34. The Book, at 493 pages, makes a host of false and defamatory statements of fact:

- See e.g., Book, p. 282 ( calling Mr. Boback "a con artist"),

- p. 419 ("LabMD got entrapped"),

- p. 405 ("How about entrapment?"),

- p. 89 (stating that Tiversa was part of "the one-two entrapment strategy"),

- p. 359 ("It wasn't until LabMD declined to engage Tiversa's 'security services' ... and then sued Tiversa ... that the FTC was compelled to issue the present CID. This unusual timing only serves to incentivize organizations to pay off Tiversa (as non-payment appears to coincide with the opening of an FTC investigation)"),

- p. 310 (discussing "Tiversa's 'pay or no play' program"),

- p. 279 (describing a conversation in which "Bloomberg" described Tiversa's business model as a "shakedown", and that Tiversa engaged in "[ q]uestionable practices, to say the least"),

- p. 375 ("Tiversa regularly contacted companies whose file they had taken in order to solicit business"),

- p. 309 (stating that Tiversa and Mr. Boback were attempting "to exploit a medical facility"),

- p. 325 ( describing the parties' interactions as "a theft case"),

- id. ("Isn't this nothing more than a flat-out case of theft?"),

• p. 111 (stating that Mr. Daugherty and LabMD "had used the terms 'hustler' and 'oily salesman' to describe" Mr. Boback),

• p. 276 ("You sneaky snake. How dare you, Tiversa, hold up our property as a means to scare others so you can close more business"),

• id. ( describing Tiversa as "Nasty"),

• p. 355 (calling Tiversa "invaders" who had perpetrated an "injustice"),

• p. 53 ("I really hate it that Boback turned this over to the FTC. I feel like we're being punished for not hiring Tiversa ..... Was it just me, or did something stink?"),

• p. 68 ("[A] security firm swip[ed] our stuff and then tum[ed] it in to the FTC"),

• p. 33 ("How much do you want to bet they're throwing us under the bus because I wouldn't hire them?"),

• id. ("Tiversa-a company that had just become even more soulless to me, if that was possible"),

• id. ("I know I wouldn't sell my soul to this particular devil no matter what the consequence"),

• p. 51 ("We know who took the goods"),

• p. 109 ("I bet he threw us under the bus because we wouldn't sign his services agreement! .... That hypocrite showed our file to Congress! He has the nerve to try to get us to pay him $40,000 and then sits in front of those representatives like he's a saint?"),

• p. 119 ("Tiversa collected (a.k.a. took with surveillance software) more than 3,000 files"),

• p. 276 ("Sounds like surveillance to me. Hey Tiversa ... who is watching you watching us?"),

• p. 325 ("Tiversa should have been aware of the confidential nature of the information when they opened a port and entered our workstation and downloaded our file"),

• p. 326 (comparing the United States government and Tiversa to "Queen Elizabeth I sending Walter Raleigh to loot Spanish ships"),

• id. (claiming that Tiversa "use[ d] software to remotely open our door locks"),

• p. 374 (stating that Tiversa "t[oo]k[] someone's property"),

• p. 390 (stating that Tiversa was "snooping on the internet for other people's property or sensitive private data").

35. Mr. Daugherty not only made statements such as these before the publication of the Book, and in the Book itself, but has continued to make such statements since the Book's publication:

• See, e.g., Author Mike Daugherty Discusses Government Overreach, available at http://www.bloomberg.com/news/2013-l 0-29/author-mikedaughterty- discusses-government-overreach-audio-.html (stating, regarding the Defendants' interactions with Plaintiffs, that "something was wrong", "it was creepy", there was a "big creepy, big brother feel", that Mr. Boback "would not give us any information unless we wanted to hire him for his services" and that Defendants "would not tell us anything unless we hired them and we didn't feel that was even a proper way to start a relationship", and were, along with Dartmouth "recipients of $24 million dollars from Homeland Security to go out and do this research, and do this paper");

• Interview by RedState.com with Michael J. Daugherty, available at www.redstate.com/2013/10/30/the-devil-inside-the-beltway/ (stating that "our file was taken and retrieved", that "information [from Tiversa] stopped unless we would retain them", and, in response to the question "how is that not extortion?", responding "I guess we're going to ask the judge that");

• Interview by Taking Stock of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/11/15/discussingthepitfallsoffederalag encies/ (stating that "when ... we wouldn't pay the company that actually took it, they got turned over to the feds" and that Tiversa was part of a "Homeland Security sponsored project");

• Interview by The Edington Post of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/12/16 (available in the section entitled "Michael Interviewed by Edington Post") (stating that Tiversa "went out and scoured the web", "wouldn't tell us anything unless we had hired them", had its lawyers "call[ and say], in a very accusatory tone of voice, you know, your standards aren't right, blah, blah, blah, we're giving this over to the Federal Trade Commission", and is, with the United States government, "snooping over everybody", and further stating that "so much of this was like a movie ... Wesley Clark on their board, and then I found out that Obama's head of cybersecurity, Howard Schmidt, is on their advisory board", "you've got academia, private business, the federal government, all intruding", "Homeland Security was paying Tiversa to go out ... , and they were monitoring thousands of work stations around the world", and also noting, in response to the question of "where can people get the Book?" that it was available at "thedevilinsidethebeltway.com", a URL which redirects the user to Mr. Daugherty's personal website);

• William Jackson, Patient Data on Filesharing Service Provokes Legal Trouble, available at www.informationweek.com/govemment/cybersecurity/patient-data-on- filesharing-service-provokes-legal-trouble/d/d-id/1113235 (quoting Mr. Daugherty as stating that "[t]his smelled of extortion");

• Interview by Joy Tiz of Michael J. Daugherty, available at http://www.blogtalkradio.corn/joytiz/2014/0 1 /02/the-devil-inside-thebeltway/ (stating that Tiversa had "a really big creepy Big Brother feeling" and in response to the statement "so, basically extortion", responding "well yeah");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/michael-j-daugherty-april-9-2014/ ( describing Tiversa as "real shady" and "anything but professional");

• Interview by Edward Woodson of Michael J. Daugherty, available at http:// ed wardwoodson. com/listen/3-1 7-14 ( stating that Tiversa "wouldn't stop pursuing us" and remarking as to the File that they "never found it ourselves out in cyberspace" and Tiversa "turned it over to the feds");

• Interview by Jack Burkman of Michael J. Daugherty, available at http://www.radioamerica.org/POD _ burkman.htm/ (responding to the question "so that's almost like extortion?" with "that's about it, yeah");

• Interview by Martha Zoller with Michael J. Daugherty, available at http://zpolitics.com/the-devil-inside-the-beltway/ (naming Tiversa as the Pennsylvania company that contacted him about the File, stating that they "[could not] find the file out in cyberspace," responding to the question "So this file was stolen from you?" with "Yeah" and stating that he was "going to start a book tour across country");

• Interview by Book Bliss of Michael J. Daugherty, available at http://bookbliss.com/2013/06/19/the-devil-inside-the-beltway/ (stating that "the government funded Dartmouth and this company Tiversa to go out and conduct a study, and to go surveil peer to peer networks");

• United States House of Representatives, Committee on Oversight and Government Reform, 7 /24/14 ("Mr. Boback told me that Tiversa had found LabMD patient data on the Internet, but refused to tell us more unless we paid and retained them"; describing Tiversa as a "protection racket"; alleging that Tiversa was "trying to scare us"; discussing "the so called 'breach'" stating that Mr. Boback "made good on his threat to us" and disregarded "the dignity of cancer patients"; "Tiversa did NOT get this file as portrayed in the Dartmouth study and Tiversa and Dartmouth knew it"; discussing "Tiversa's creation of the FTC's investigation after LabMD refused to retain Tiversa");

• Interview by Frank Schneider of Michael J. Daugherty, available at http://www.iheart.com/show/Rod-Arquette-Show/episodes/ (noting, without solicitation, that Tiversa was based in Pittsburgh, Pennsylvania; responding to the claim that Tiversa had said "hey we've got a bunch of your files that we got into your system and got a hold of' with the allegation that "they were very sneaky and wouldn't say anything unless we paid them for more information"; stating that Tiversa is "essentially a private company that's collected 13 million files from all of us"; agreeing with the statement that Tiversa "in a clandestine manner, in a secret manner, sneaks inside of servers of small companies and big companies, all over the country and yanks files of confidential information out of those servers and gathers those together"; stating that the file had been "clandestinely possessed"; discussing the Privacy Institute, and stating that "the FTC thought of I and that Tiversa built it and that's how they funneled these files from Tiversa to the FTC");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/october-7-2014/ (noting, unsolicited, that Tiversa was based in Pittsburgh, Pennsylvania; alleging that Tiversa is "working with the feds"; "He would say nothing unless we paid him. And then it got more aggressive"; "And he said he was going to turn us over to the feds. And he did turn us over to the feds"; discussing files, and stating that Tiversa "went and took them and they keep them");

• Interview by Dana Roe of Michael J. Daugherty, available at http://danaroc.com/inspiring_ 020314michaeldaughtery.html (noting, unsolicited, that Tiversa was based in Pennsylvania; stating that Tiversa engages in "all of this macho power talk ... about how large and in charge they are on monitoring and finding all of these files"; stating that Mr. Boback "wouldn't tell us anything unless we hired him and that's what was bothering everybody"; stating that LabMD "was not leaking files"; stating that Tiversa told LabMD "we are going to give this to the Federal Trade Commission"; stating that Tiversa "threatened to go to the Feds");

• Interview by Tom Barnard of Michael J. Daugherty, available at http://www.tombarnardpodcast.com/ (noting, unsolicited, that Tiversa was based in Pittsburgh; "he wouldn't tell [me] anything unless we paid him"; stating that LabMD was "hacked"; stating that "a whistleblower outside Tiversa came up, was manned up, stood up and said 'I need immunity cause a whole lot of bad stuff is going down over here'"; stating that "agencies were getting lied to, companies were getting lied to"; stating that "Tiversa was less than truthful to the Feds, how they got it has been alleged to be a lie, where they found it is alleged to be a lie");

• Interview by Cynthia Dillion of Michael J. Daugherty, available at http://wsradio.com/030614-live-from-cpac-cyber-security-michael-daugherty-youth-conservative-outreach-for-the-rnc-raffi-williams/ (stating that Tiversa "wouldn't answer any questions other than they had it and prove they had it unless we paid them"; "our property was turned over by them to the ... Federal Trade Commission");

• Interview by Marianne Kolbasuk McGee of Michael J. Daugherty, available at http://www.healthcareinfosecurity.com/interviews/labmd-ceodescribes- his-beefs-ftc-i-2184 ("We could not get any answers out of them as to how, where or what unless we hired them, which created a huge issue of distrust");

• 9/10/13 Panelist Briefing of Tech Freedom and Cause of Action, available at http://www.youtube.com/watch?v=MqfcDmBJgvc (stating that "no answers would come back unless we signed a services agreement"; stating that Tiversa's communication "gave us a real big brother feel, like who is watching us, here?"; responding to the question "and you said no and you fixed the problem yourself, and then they turned you over to the FTC" with the response "correct"; "we know someone came in and took" the File);

• Interview by Cindy Graves of Michael J. Daugherty, available at http://www.wbobradio.com/2014/10/0l/cindy-graves-show-hr-2-10114/   (stating that "he wouldn't tell us unless we paid him", that "he wouldn't give us any information unless we hired him ... ", that "it just was so creepy from the beginning, so Big Brother, ... ", that "he turns it over to the Feds", that "these guys were working - Homeland Security gave $24 million to Dartmouth and they use this company's technology .... And they were monitoring and taking possession of all these files ... ", that the FTC was "sitting with this company that's gathering the stuff. It's a private enterprise that's ... building ... this whole mountain of military information, tax records, medical records. They're taking possession of it", responding to the statement that "it looks like the government ... employed them to hack into your system and then say, ah hah! I hacked into your system. Now you need to pay me to - to plug that leak" with the statement "Right, right", stating that "[t]hey took my stuff");

• Interview by Stacy Harp of Michael J. Daugherty, available at http://www.blogtalkradio.com/acmedia/2014/10/01   /the-devil-inside-thebeltway-the-shocking-expose-of-the-govts-surveillance (stating that "he was setting us up. And he wouldn't tell us anything about how he got it unless we hired him", that "that was very creepy ....... it was a Big Brother type feel. It - it felt like a shakedown. It felt extortionistic. It did. If felt like this guy's not going to give us anything unless we paid him and hired him", stating that "here was a private company that's working with a funded study and a major university looking and monitoring us and downloading 13 million workstations - files ..... why is it theirs to take and hold and keep and not tell us what they've done with it or how they got it?", responding to the statement that "I'm hoping that this investigation, if there are any ties between Tiversa and the FTC that you know, there's a scratch each other's back kind of arrangement where people who don't buy our services, you know, you go after them, sue them and we'll take a cut, you know, we'll divvy up the loot. If such a thing is going on it wouldn't surprise me. I hope that that you know, hope that comes out as part of this investigation" with the response that "Oh well, it's going on all right and I can talk about that").

36. In essence, Mr. Daugherty has echoed, in many different mediums, the main crux of the Book: that Tiversa and Mr. Boback illegally accessed and stole LabMD's files, and then extorted LabMD in an attempt to obtain business. When LabMD refused, according to Mr. Daugherty, Tiversa and Mr. Boback sent the files to the FTC, to begin an investigation into Lab MD. Thus, Mr. Daugherty and LabMD have accused Tiversa and Mr. Boback of being criminals, who have engaged in crimes involving crimen falsi, by being thieves, extortionists, con artists and parties to a government conspiracy somehow intended to defraud Mr. Daugherty and LabMD.

39. As described in Paragraphs 31-36, LabMD and Mr. Daugherty disregarded the November 8, 2012 letter entirely by making statements, and publishing the Book. Those statements, and the Book, therefore, were made with knowledge of their falsehood or reckless disregard for the fact that they were false.

40. Moreover, upon information and belief- both prior to and after publication of the Book - Mr. Daugherty became aware that LabMD files made available on a peer to peer file sharing network are "public" because of LabMD's downloading of Lime Wire.

41. Upon information and belief, in May 2013, Mr. Daugherty was informed that the allegations he had levied against Plaintiffs were false and betrayed a general misunderstanding of P2P technology. Mr. Daugherty elected to willfully ignore those warnings.

43. LabMD and Mr. Daugherty have willfully, intentionally, wantonly, maliciously, and repeatedly spread their allegations, targeted to Pennsylvania, regarding Pennsylvania residents, and with knowledge that those allegations would cause harm to those Pennsylvania residents in this Commonwealth.

44. LabMD's and Mr. Daugherty's allegations regarding Mr. Boback's and Tiversa's conduct are false and actionable.

52. Specifically, prior to Mr. Wallace's final disposition of the Tiversa stock which occurred on May 9, 2014, Mr. Wallace was allegedly in contact with the House Committee on Oversight and Government Reform in an effort to provide false and disparaging information regarding Tiversa. Upon information and belief, Mr. Wallace had also corresponded with LabMD and CoA to discuss providing false and disparaging information regarding Tiversa.

64. CoA and/or LabMD and/or Mr. Daugherty have knowingly ignored the falsehoods provided to them by Mr. Wallace in exchange for conspiring to act maliciously against Plaintiffs.

65. Any and all allegations of Mr. Wallace regarding nefarious activity of Tiversa during Mr. Wallace's tenure as an employee are false. Any illegal or improper actions taken by Mr. Wallace while an employee of Tiversa, if any, were taken without Tiversa's knowledge, and were outside the scope of Mr. Wallace's employment with Tiversa.

68. Upon information and belief, the Committee's investigation was triggered by CoA providing the Committee with the false allegations made by Mr. Wallace.

98. There is no conditionally privileged occasion which exists to allow Mr. Daugherty or LabMD to have made the defamatory statements. In the alternative, Mr. Daugherty and LabMD, as demonstrated above, have abused a conditionally privileged occasion to the extent any exist, which Plaintiffs deny.

99. and 106.  Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and Lab MD have acted with actual malice.

100., 107. and 114. Mr. Daugherty's and LabMD's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on Mr. Daugherty and LabMD's part. Mr. Daugherty and LabMD had an appreciation for, and consciously disregarded, the risk of harm to Plaintiffs which their conduct entailed.

102., 113. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and LabMD have acted with actual malice.

109. The statements made by Mr. Daugherty and LabMD, discussed in Paragraphs 31- 36, are false.

110. Mr. Daugherty and LabMD had no privilege to make these statements.

115. Upon information and belief the Committee's investigation into Tiversa was triggered by CoA's provision of Mr. Wallace's false statements regarding Tiversa.

123. The Defendants LabMD, Mr. Daugherty, CoA, and Mr. Wallace combined and agreed to - acting with the intent to injure the Plaintiffs through an unlawful act or through an otherwise lawful act but by unlawful means, and without justification to do so - and took actions in furtherance of their agreement to cause harm to Tiversa by, among other things and without limitation, interfering with its existing contractual relations.

124. The Defendants' behavior was not to petition the government for redress of grievances, but instead to corrupt governmental processes in an attempt to interfere directly with Tiversa's contractual relationships and, generally, to cause as much harm as possible to Tiversa and Mr. Boback as nothing more than revenge for the perceived wrongful conduct of those parties.

107.     The allegations set forth above are false because (1) Tiversa illegally hacked into

and took the 1718 File from a LabMD computer in Atlanta, Georgia on February 25, 2008, without

LabMD's knowledge, authority or permission; (2) Tiversa illegally used law enforcement surveillance software owned by the federal government to search for, access and download the 1718 File from LabMD's computer; (3) the taking of the 1718 File violated several state and federal criminal statutes including, without limitation, 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information); (4) Tiversa never located or downloaded the 1718 File from any computer other than LabMD's computer in Atlanta, Georgia; (5) Tiversa's internal documents establish that Tiversa took the 1718 File *directly* and *solely* from a LabMD computer in Atlanta, Georgia; (6) Tiversa never located or downloaded the 1718 File from a computer in San Diego, California; (7) the 1718 File never "spread" anywhere in cyberspace; (8) the 1718 File was never found or downloaded from computers of known bad actors (*e.g.,* identity thieves); (9) the 1718 File was never publicly available; (10) LabMD did not leak the 1718 File; (11) Tiversa leaked the 1718 File; (12) Tiversa partnered with Dartmouth College to search for and take the 1718 File as part of a federally-funded study by Dartmouth; (13) Tiversa, through its attorney Jim Cook, threatened to turn LabMD in to the FTC if LabMD did not hire Tiversa; (14) Tiversa gave the FTC a list of approximately 100 companies Tiversa claimed leaked confidential files on the internet (some or all of those companies had rejected Tiversa's solicitations of business); (15) Tiversa attorney Eric Kline created The Privacy Institute at the suggestion of FTC investigator Ruth Yodaiken as a means for Tiversa to funnel documents to the FTC in secret; (16) Neither Tiversa nor The Privacy Institute ever produced anything to the FTC under "threat;" (17) Tiversa's reward for turning companies in to the FTC was its receipt of more business due, for example, to prospective customers' fear of FTC investigations and prosecutions; (18) The FTC helped Tiversa secure more business by giving it advance notice of the companies to whom it was sending inquiry letters; (19) Tiversa's documentary evidence that Tiversa located and downloaded the 1718 File

from a computer in San Diego, California (*e.g.*, CX0019, Chopra Affidavit) was fabricated; (20) Tiversa's documentary evidence of spread of the 1718 File (*e.g.*, CX0019, Chopra Affidavit) was fabricated; and (21) Boback's testimony regarding the alleged spread of the 1718 File was false.

108.    Each of the false allegation in the amended complaint in the State Defamation Action, which also constituted defamation per se pursuant to 42 Pa.C.S. §§ 8353, injured the reputations of Daugherty and LabMD and chilled the sales of *The Devil Inside the Beltway*.

109.    The amended complaint in the State Defamation Action caused Daugherty to suffer emotional distress.

110.    Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the allegations above were false.

111.    Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the claims in the amended complaint in the State Defamation Action were invalid.

112.     Tiversa, Boback, Reed Smith and Shaw had no probable cause for the amended complaint in the State Defamation Action.

113.    Neither Tiversa, Boback, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in the amended complaint in the State Defamation Action were based.

114.    Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of the amended complaint in the State Defamation Action was not intended to merely harass or maliciously injure Daugherty and LabMD.

115.    Neither Tiversa nor Boback reasonably believed in the existence of facts upon which the claims in the amended complaint in the State Defamation Action were based due to

reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

116.    On April 20, 2015, Reed Smith and Shaw sent affidavits of Boback and Anju Chopra, Tiversa's chief technical officer, to Laura VanDruff, FTC's lead counsel in the enforcement action against LabMD.  Reed Smith and Shaw provided those affidavits to the FTC in order for the agency to discredit Wallace and to prove that Tiversa found and downloaded LabMD's 1718 File from computers at seven different locations on the internet.

117.     Boback and Chopra's affidavits, true and correct copies of which are attached hereto as Exhibits I and J, respectively, falsely authenticate the fabricated emails Tiversa attached to the Notice of Information.  The fraudulent emails purported to support the false data in the Tagliaferri Report.

118.    Reed Smith and Shaw knew or should have known that the Boback and Chopra affidavits they prepared and submitted to the FTC were false.

119.    On February 10, 2015, Boback published an article in Pathology Blawg that contained a number of intentionally defamatory statements about LabMD and Daugherty, including the following:

> LabMD lawsuit - The claims are baseless and completely unsubstantiated . . . . even in the complaint itself. This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients.

120.    Boback published defamatory statements about LabMD and Daugherty in Pathology Blawg not only to injure the reputations of LabMD and Daugherty but also to prevent LabMD from ever becoming a cancer detection laboratory again.   Boback knew that LabMD, a cancer-detection laboratory, could not survive without a certified uropathologist.

121.    Boback's defamatory statements in The Pathology Blawg were intended to and did injure the reputations of LabMD and Daugherty.

122.    Reed Smith and Shaw either knew or should have known that Boback's article in the Pathology Blawg contained false statements.

123.    On information and belief, Reed Smith and/or Shaw drafted or assisted in the drafting of Boback's defamatory statements in the Pathology Blawg.

124.    Wallace testified under immunity in the enforcement action on May 5, 2015, where he disclosed the following:

– On February 25, 2008, Tiversa located the 1718 File on a LabMD computer near Atlanta, Georgia.

– Tiversa never found the 1718 File anywhere other than on a LabMD computer.

– In April 2008, Tiversa reported to CIGNA (in the CIGNA Report), one of its customers, that Tiversa had located LabMD's 1718 File on a LabMD computer at a LabMD IP address near Atlanta, Georgia.

– Tiversa reported the "disclosure" of the 1718 File to CIGNA in the hope that CIGNA would pressure LabMD to become a Tiversa client.

– It was Tiversa's practice to create Incident Record Forms for Boback and others at Tiversa to use as a list of prospective customers.  Tiversa would make cold calls to the prospective companies to describe the "problem" they were having and to offer Tiversa's remediation services.

– At Boback's direction, Tiversa employees would manipulate the data in Tiversa's data repositories to make it appear that prospective customers' files had spread to other locations on the peer-to-peer networks.  This was often done to give Boback a reason to contact a prospective customer again.  Boback would report, for example, that a prospective customer's computer file had spread to computers owned by known identify thieves.

– Tiversa would never tell prospective customers where their files were found.  Tiversa would claim that the IP address of the source computers were not recorded.  Wallace said this was a lie – Tiversa always knew the IP addresses of the source computers.

– Wallace testified about an exhibit marked as RX 551.  This was the list of names and other information on approximately 89 companies that Tiversa created to give to the

58

FTC in response to the civil investigative demand the FTC would serve on The Privacy Institute.   According to Tiversa, all of the companies on this list (the "List," identified above) had experienced data breaches.

–   Wallace explained that companies on the List were chosen "so that the FTC would contact them and notify them of a data breach and hopefully we would be able to sell our services to them."

–   In the fall of 2009, Wallace, Boback and other Tiversa employees travelled to Washington, D.C. to discuss the File with the FTC.

–   After their return from D.C., Boback contacted people on the List to tell them that the FTC would be taking action against them if they did not become Tiversa clients.

–   Boback told Wallace to include LabMD on the List in retaliation for LabMD not hiring Tiversa.

–   At some point before Boback's deposition on November 21, 2013, Boback told Wallace to change the data in Tiversa's data store to make sure that the 1718 File did not appear to have come from the Atlanta area.

–   Boback directed Wallace "that under no circumstances can the insurance aging file originate from a Georgia IP address or an Atlanta area IP address. And in addition to that, [Boback] told [Wallace] to find an individual in San Diego to include with this list."

–   Also in November 2013, Boback directed Wallace to prepare CX0019.  The addresses were of known identify thieves.

125.    Wallace's testimony, a true and correct copy of is attached hereto as Exhibit K and incorporated herein by reference) was so obviously true that on August 12, 2015, on p. 61 of its Corrected Post-Trial Brief filed in the enforcement action, the FTC withdrew all reliance upon CX0019, Boback's testimony and all expert opinions that were predicated on Boback's testimony.

126.    The following excerpts are from a report titled *Staff Of Comm. On Oversight & Gov't Reform, 113th Cong., Tiversa, Inc.: White Knight Or High-Tech Protection Racket?* 67 (2015) (Prepared for Chairman Darrell E. Issa) (the "OGR Report") (a true and correct copy of which is attached hereto as Exhibit L and incorporated herein by reference), which was published on January 2, 2015, but embargoed until after Wallace testified on May 5, 2015:

Committee staff interviewed Tiversa's CEO, Robert Boback, on June 5, 2014. Boback's testimony failed to assuage Committee's concerns and instead raised many more questions about the relationship between Tiversa and various federal government agencies. Two days later, Boback was deposed for a second time in the FTC action against LabMD. There were several major inconsistencies between this testimony and the testimony he provided to the Committee only days earlier. (p. 5).

Boback created a culture of intimidation at Tiversa. The Committee has unfortunately learned that Boback is continuing his intimidation tactics toward former employees that have cooperated with this Committee's investigation. Tiversa has refused to pay legal fees that Gormley accrued while cooperating with this investigation and the FTC matter against LabMD, despite an agreement with Tiversa that he would be indemnified. Boback has further sued Richard Wallace and lawyers representing LabMD in a defamation action in Pennsylvania. The suit against Wallace effectively questions Mr. Wallace's Constitutional right to speak with Congress after the Committee approached him with questions related to allegations about Tiversa. These are clear instances of witness intimidation and interference with a congressional investigation on the part of Boback and Tiversa. (p. 9).

The Committee found that information provided by Tiversa—such as that on the Marine One leak—not only could not be verified, but at times appeared to be outright false. Given all the Committee has learned about Boback and Tiversa, the extent of its relationship with the Federal Trade Commission is extremely concerning. (p. 53).

Documents and testimony obtained by the Committee in the course of its investigation displayed a troubling pattern with respect to Tiversa's business practices. Tiversa routinely provided falsified information to federal government agencies. Instead of acting as the "white knight" the company purports to be, Tiversa often acted unethically and sometimes unlawfully after downloading documents unintentionally exposed on peer-to-peer networks. At least one Tiversa employee, under the direction of Boback, provided intentionally false information to the United States government on more than one occasion. This is a crime. In addition, Boback provided false testimony about fabricated documents to the U.S. House of Representatives. (p. 5).

In many instances, documents that Tiversa produced to the Committee pursuant to a subpoena issued on June 3, 2014 lacked important context without explanation. Such gaps prompted the Committee to ask Tiversa's representatives on several occasions whether the company had produced all documents responsive to the Committee's subpoena as well as search terms proposed by Committee staff. Tiversa did not provide the Committee with assurances or a written statement that all documents had, in fact, been produced. Accordingly, the Committee sought to obtain additional information from third parties. These third parties provided a substantial number of documents to the Committee that Tiversa failed to produce. For example, Tiversa never produced documents showing it had advanced non-public knowledge of FTC enforcement actions and took steps to profit from that knowledge. The Committee also found that Tiversa withheld from the FTC a series of documents that are inconsistent with testimony company officials provided under oath. Tiversa's lack of cooperation with this investigation, and the withholding of key documents

from the FTC, lead the Committee to believe that Tiversa has not produced all relevant documents responsive to this Committee's subpoena. (pp. 5-6).

According to the testimony of a whistleblower and documents obtained in this investigation, Tiversa appears to have provided intentionally false information to this Committee and numerous other federal departments and agencies. Tiversa has further used and overstated its relationships with Congress and federal agencies to advance its unethical business model. The Committee's findings should give pause to any government entities which have relied or are planning to rely on information provided by Tiversa. (p. 6).

Throughout this investigation, the Committee routinely found that information provided by Tiversa either could not be verified, or simply did not make sense. Part of the story always seemed to be missing. The whistleblower's testimony that Tiversa routinely falsified documents, however, filled in these gaps. (p. 7).

Given these numerous instances in which Tiversa failed to fully provide information to the Committee and the FTC, the Committee strongly believes that Tiversa may be withholding additional relevant documents. Tiversa's failure to produce numerous relevant documents to this Committee and the FTC, at a minimum, demonstrates a lack of good faith. At worst, Tiversa intentionally withheld documents and other information in the face of multiple subpoenas. Either way, Tiversa's actions call into question the credibility of the company and its CEO, Robert Boback, as a source of information for the FTC. (p. 8).

127.    Despite Wallace's testimony in the enforcement action, despite the findings of the OGR Staff, despite the FTC's recognition that CX0019 and Boback's testimony were false, despite the September 5, 2013 Email and despite the CIGNA Report, Tiversa, Boback, Reed Smith and Shaw pressed forward with their malicious prosecution of Daugherty and LabMD.  On September 8, 2015, Tiversa, Boback, Reed Smith and Shaw filed a second amended complaint in the State Defamation Action, a true and correct copy of which is attached hereto, marked as Exhibit M and incorporated by reference herein.  Tiversa, Boback, Reed Smith and Shaw made the following false statements in that complaint:

[From the preliminary statement] Tiversa and Mr. Boback bring this action to remedy Defendants' past and continuing attempts to harm them through extensive misconduct and false and defamatory statements they have made with full knowledge that their conduct was egregious, improper, and wrong.

When faced with the consequences of their failures to properly protect the confidential information of their patients - a fact they have now admitted in adjudicative filings –

LabMD and Mr. Daugherty could have accepted responsibility, remedied those failures, and continued doing business. Instead, unable to grasp the concept of their own fallibility, LabMD and Mr. Daugherty sought revenge upon the parties who had revealed their missteps, and published a book containing defamatory statements about Tiversa and Mr. Boback which LabMD and Mr. Daugherty knew were false.

In an attempt to justify the defamatory statements, Mr. Wallace, with the assistance of Mr. Daugherty, LabMD, and CoA, spread lies and made misleading statements about Tiversa and Mr. Boback, and as a result, he has eschewed his contractual obligations. As a product of all of this behavior, Tiversa and Mr. Boback seek damages - both compensatory and punitive - arising from the Defendants' egregious, improper, and outrageous conduct.

LabMD and Mr. Daugherty have compounded their original mistake - a failure to protect confidential information - by, with the help of Mr. Wallace and CoA, committing yet another blunder: the disparagement of Tiversa and Mr. Boback, in the name of revenge for imagined, delusional outrages. This cannot stand.

16. The File was downloaded by Tiversa from various IP addresses. The File was available on these networks because LabMD downloaded Lime Wire on one of its computers making the File available to the public.

17. The File was downloaded by Tiversa from various IP addresses. The File was available on these networks because LabMD downloaded Lime Wire on one of its computers making the File available to the public. See id. In October of 2012, the Sacramento, California Police Department found more than 35 LabMD Day Sheets, and approximately 10 copied checks made payable to LabMD in a house in Sacramento, California. See id.

23. Armed with this knowledge, the FTC visited Tiversa, and attempted to obtain any and all non-redacted files in Tiversa' s possession, which, among other things, contained Social Security Numbers.

24. Tiversa refused to produce anything directly to the FTC. Instead, Tiversa elected to create an entity called the Privacy Institute and the FTC served that entity with a Civil Investigative Demand pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-l (the "CID"). The CID did not specifically identify Defendants.

25. In August of 2009 the Privacy Institute responded to the CID and provided responses including a spreadsheet that contained, inter alia, information related to companies that had file-shared documents containing unique personal identifying information ("PII"), including the Data Owner, File Title(s), Unique Individuals' PII, IP Address, and date.

30. Mr. Daugherty and LabMD intentionally made false and defamatory statements regarding the Plaintiffs before, in, and after the publication of the Book.

31. In his video "trailer" for the Book, available on, inter alia, Mr. Daugherty's personal website, Mr. Daugherty highlights his position as LabMD's President and CEO and Mr. Daugherty alleges that Tiversa is part of a "Government Funded Data Mining &

Surveillance" scheme that engages in "Psychological Warfare" and helps to assist in "Abusive Government Shakedown[s]." See www.michaeljdaugherty.com. More specifically, Mr. Daugherty alleges Tiversa is conducting "300 Million Searches per day" for "Homeland Security" and the "Federal Trade Commission." See id.

32. Mr. Daugherty made a host of additional statements prior to the Book's publication:

> • Mr. Daugherty claims that Tiversa "downloaded" the File "and would not answer our questions unless we hired them, kicked the file over to the feds, and then the Federal Trade Commission began overwhelming our
> small business, a cancer detection center, with their beltway tactics." See id.

> • See also Video of Heritage Foundation Blogger Brief (stating that Tiversa and Mr. Boback wouldn't "give [LabMD] any information unless we hired him which I wouldn't do" that "we, to this day, don't feel like our file ever got out" and that "we don't even believe that there was a breach");

> • www.michaeljdaugherty.com/2012/09/16/the-ftc-is-suing-me/ (alleging that Tiversa "took our file without authorization");

> • Amy Wenk, Atlanta Medical Lab Facing Off Against FTC, Atlanta Business Chronicle, September 7, 2012, p. 3A, 22A ("'This is a property theft case,' Daugherty said. '[Tiversa] came in and affected our network'");

> • www.indiegogo.com/projects/the-devil-inside-the-beltway/ (stating, on a website created by Mr. Daugherty, that "[w]hat began with the unauthorized but government-funded procurement of medical data for 9000+ patients from his medical laboratory turned into a government supported, financially draining, extortion attempt");

> • Interview by Accuracy in Media with Michael J. Daugherty, available at www.michaeljdaugherty.com/media (stating that Tiversa "did not find [the File] out on cyberspace", that "the [F]ile was taken by a government funded study and a group from Dartmouth and a company named Tiversa", and that Tiversa "took" LabMD's property);

> • Interview by Tea Party News Network with Michael J. Daugherty, available at http://www.youtube.com/watch?v=-x6UDWwdevw (stating that "Homeland Security paid [Tiversa] to surveil 4.5 million workstations around the world" and that "Homeland Security gave $24 million dollars to Dartmouth and Tiversa to go out and surveil the web");

> • Interview by The Mike Huckabee Show, available at http://www.mediafire.com/I isten/ anqxg 16hdbay4 hg/Michael+ Daugherty+ 9+23+ 1 3.mp3 (stating, in response to the assertion "this sounds like a blackmail case" that "I can say we felt like something really bad was going on" and that "no one was willing to help us or

educate us unless we paid them", that "we couldn't get any more information from [Tiversa] unless we were willing to sign a services agreement which we considered it was nefarious", that "Homeland Security gave a $24 million dollar grant to Dartmouth who worked with Tiversa to go and a they use the word 'monitor' for files", that "the left hand took it and the right hand's slapping me", that "the next thing you know the FTC has [the File] and they're investigating me. It was quite clubby", responding to the question "somebody is able to infiltrate into your system, and I guess like a vacuum cleaner suck everything out of it, and then make copies of all those records; is that essentially what happened?" with the response of "Yea, we lost stuff', and responding to the statement that "I might leave a lawnmower in my yard, so it could be accessible, but ... nobody just has a right to come by and take it home with them" with the assertion "right, it's shocking").

33. Mr. Daugherty further alleges that "the feds" are "paying contractors to surveil for medical files[.]" See Trailer for The Devil Inside the Beltway.

34. The Book, at 493 pages, makes a host of false and defamatory statements of fact:

• See e.g., Book, p. 282 ( calling Mr. Boback "a con artist"),

• p. 419 ("LabMD got entrapped"),

• p. 405 ("How about entrapment?"),

• p. 89 (stating that Tiversa was part of "the one-two entrapment strategy"),

• p. 359 ("It wasn't until LabMD declined to engage Tiversa's 'security services' ... and then sued Tiversa ... that the FTC was compelled to issue the present CID. This unusual timing only serves to incentivize organizations to pay off Tiversa (as non-payment appears to coincide with the opening of an FTC investigation)"),

• p. 310 (discussing "Tiversa's 'pay or no play' program"),

• p. 279 (describing a conversation in which "Bloomberg" described Tiversa's business model as a "shakedown", and that Tiversa engaged in "[ q]uestionable practices, to say the least"),

• p. 375 ("Tiversa regularly contacted companies whose file they had taken in order to solicit business"),

• p. 309 (stating that Tiversa and Mr. Boback were attempting "to exploit a medical facility"),

• p. 325 ( describing the parties' interactions as "a theft case"),

• id. ("Isn't this nothing more than a flat-out case of theft?"),

• p. 111 (stating that Mr. Daugherty and LabMD "had used the terms 'hustler' and 'oily salesman' to describe" Mr. Boback),

• p. 276 ("You sneaky snake. How dare you, Tiversa, hold up our property as a means to scare others so you can close more business"),

• id. ( describing Tiversa as "Nasty"),

• p. 355 (calling Tiversa "invaders" who had perpetrated an "injustice"),

• p. 53 ("I really hate it that Boback turned this over to the FTC. I feel like we're being punished for not hiring Tiversa ..... Was it just me, or did something stink?"),

• p. 68 ("[A] security firm swip[ed] our stuff and then tum[ ed] it in to the FTC"),

• p. 33 ("How much do you want to bet they're throwing us under the bus because I wouldn't hire them?"),

• id. ("Tiversa-a company that had just become even more soulless to me, if that was possible"),

• id. ("I know I wouldn't sell my soul to this particular devil no matter what the consequence"),

• p. 51 ("We know who took the goods"),

• p. 109 ("I bet he threw us under the bus because we wouldn't sign his services agreement! .... That hypocrite showed our file to Congress! He has the nerve to try to get us to pay him $40,000 and then sits in front of those representatives like he's a saint?"),

• p. 119 ("Tiversa collected (a.k.a. took with surveillance software) more than 3,000 files"),

• p. 276 ("Sounds like surveillance to me. Hey Tiversa ... who is watching you watching us?"),

• p. 325 ("Tiversa should have been aware of the confidential nature of the information when they opened a port and entered our workstation and downloaded our file"),

• p. 326 (comparing the United States government and Tiversa to "Queen Elizabeth I sending Walter Raleigh to loot Spanish ships"),

• id. (claiming that Tiversa "use[ d] software to remotely open our door locks"),

• p. 374 (stating that Tiversa "t[oo]k[] someone's property"),

• p. 390 (stating that Tiversa was "snooping on the internet for other people's property or sensitive private data").

35. Mr. Daugherty not only made statements such as these before the publication of the Book, and in the Book itself, but has continued to make such statements since the Book's publication:

• See, e.g., Author Mike Daugherty Discusses Government Overreach, available at http://www.bloomberg.com/news/2013-l 0-29/author-mikedaughterty- discusses-government-overreach-audio-.html (stating, regarding the Defendants' interactions with Plaintiffs, that "something was wrong", "it was creepy", there was a "big creepy, big brother feel", that Mr. Boback "would not give us any information unless we wanted to hire him for his services" and that Defendants "would not tell us anything unless we hired them and we didn't feel that was even a proper way to start a relationship", and were, along with Dartmouth "recipients of $24 million dollars from Homeland Security to go out and do this research, and do this paper");

• Interview by RedState.com with Michael J. Daugherty, available at www.redstate.com/2013/10/30/the-devil-inside-the-beltway/ (stating that "our file was taken and retrieved", that "information [from Tiversa] stopped unless we would retain them", and, in response to the question "how is that not extortion?", responding "I guess we're going to ask the judge that");

• Interview by Taking Stock of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/11/15/discussingthepitfallsoffederalag encies/ (stating that "when ... we wouldn't pay the company that actually took it, they got turned over to the feds" and that Tiversa was part of a "Homeland Security sponsored project");

• Interview by The Edington Post of Michael J. Daugherty, available at http://michaeljdaugherty.com/2013/12/16 (available in the section entitled "Michael Interviewed by Edington Post") (stating that Tiversa "went out and scoured the web", "wouldn't tell us anything unless we had hired them", had its lawyers "call[ and say], in a very accusatory tone of voice, you know, your standards aren't right, blah, blah, blah, we're giving this over to the Federal Trade Commission", and is, with the United States government, "snooping over everybody", and further stating that "so much of this was like a movie ... Wesley Clark on their board, and then I found out that Obama's head of cybersecurity, Howard Schmidt, is on their advisory board", "you've got academia, private business, the federal government, all intruding", "Homeland Security was paying Tiversa to go out ... , and they were monitoring thousands of work stations around the world", and also noting, in response to the question of "where can people get

the Book?" that it was available at "thedevilinsidethebeltway.com", a URL which redirects the user to Mr. Daugherty's personal website);

• William Jackson, Patient Data on Filesharing Service Provokes Legal Trouble, available at www.informationweek.com/govemment/cybersecurity/patient-data-on- filesharing-service-provokes-legal-trouble/d/d-id/1113235 (quoting Mr. Daugherty as stating that "[t]his smelled of extortion");

• Interview by Joy Tiz of Michael J. Daugherty, available at http://www.blogtalkradio.corn/joytiz/2014/0 1 /02/the-devil-inside-thebeltway/ (stating that Tiversa had "a really big creepy Big Brother feeling" and in response to the statement "so, basically extortion", responding "well yeah");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/michael-j-daugherty-april-9-2014/ ( describing Tiversa as "real shady" and "anything but professional");

• Interview by Edward Woodson of Michael J. Daugherty, available at http:// ed wardwoodson. com/listen/3-1 7-14 ( stating that Tiversa "wouldn't stop pursuing us" and remarking as to the File that they "never found it ourselves out in cyberspace" and Tiversa "turned it over to the feds");

• Interview by Jack Burkman of Michael J. Daugherty, available at http://www.radioamerica.org/POD _ burkman.htm/ (responding to the question "so that's almost like extortion?" with "that's about it, yeah");

• Interview by Martha Zoller with Michael J. Daugherty, available at http://zpolitics.com/the-devil-inside-the-beltway/ (naming Tiversa as the Pennsylvania company that contacted him about the File, stating that they "[could not] find the file out in cyberspace," responding to the question "So this file was stolen from you?" with "Yeah" and stating that he was "going to start a book tour across country");

• Interview by Book Bliss of Michael J. Daugherty, available at http://bookbliss.com/2013/06/19/the-devil-inside-the-beltway/ (stating that "the government funded Dartmouth and this company Tiversa to go out and conduct a study, and to go surveil peer to peer networks");

• United States House of Representatives, Committee on Oversight and Government Reform, 7 /24/14 ("Mr. Boback told me that Tiversa had found LabMD patient data on the Internet, but refused to tell us more unless we paid and retained them"; describing Tiversa as a "protection racket"; alleging that Tiversa was "trying to scare us"; discussing "the so called 'breach'" stating that Mr. Boback "made good on his threat to us" and disregarded "the dignity of cancer patients"; "Tiversa did NOT get this file as portrayed in the Dartmouth study and Tiversa and

Dartmouth knew it"; discussing "Tiversa's creation of the FTC's investigation after LabMD refused to retain Tiversa");

• Interview by Frank Schneider of Michael J. Daugherty, available at http://www.iheart.com/show/Rod-Arquette-Show/episodes/ (noting, without solicitation, that Tiversa was based in Pittsburgh, Pennsylvania;
responding to the claim that Tiversa had said "hey we've got a bunch of your files that we got into your system and got a hold of" with the allegation that "they were very sneaky and wouldn't say anything unless we paid them for more information"; stating that Tiversa is "essentially a private company that's collected 13 million files from all of us"; agreeing with the statement that Tiversa "in a clandestine manner, in a secret manner, sneaks inside of servers of small companies and big companies, all over the country and yanks files of confidential information out of those servers and gathers those together"; stating that the file had been "clandestinely possessed"; discussing the Privacy Institute, and stating that "the FTC thought of I and that Tiversa built it and that's how they funneled these files from Tiversa to the FTC");

• Interview by Bill Martinez of Michael J. Daugherty, available at http://billmartinezlive.com/october-7-2014/ (noting, unsolicited, that Tiversa was based in Pittsburgh, Pennsylvania; alleging that Tiversa is "working with the feds"; "He would say nothing unless we paid him. And then it got more aggressive"; "And he said he was going to turn us over to the feds. And he did turn us over to the feds"; discussing files, and stating that Tiversa "went and took them and they keep them");

• Interview by Dana Roe of Michael J. Daugherty, available at http://danaroc.com/inspiring_ 020314michaeldaughtery.html (noting, unsolicited, that Tiversa was based in Pennsylvania; stating that Tiversa engages in "all of this macho power talk ... about how large and in charge they are on monitoring and finding all of these files"; stating that Mr. Boback "wouldn't tell us anything unless we hired him and that's what was bothering everybody"; stating that LabMD "was not leaking files"; stating that Tiversa told LabMD "we are going to give this to the Federal Trade Commission"; stating that Tiversa "threatened to go to the Feds");

• Interview by Tom Barnard of Michael J. Daugherty, available at http://www.tombarnardpodcast.com/ (noting, unsolicited, that Tiversa was based in Pittsburgh; "he wouldn't tell [me] anything unless we paid him"; stating that LabMD was "hacked"; stating that "a whistleblower outside Tiversa came up, was manned up, stood up and said 'I need immunity cause a whole lot of bad stuff is going down over here'"; stating that "agencies were getting lied to, companies were getting lied to"; stating that "Tiversa was less than truthful to the Feds, how they got it has been alleged to be a lie, where they found it is alleged to be a lie");

• Interview by Cynthia Dillon of Michael J. Daugherty, available at http://wsradio.com/030614-live-from-cpac-cyber-security-michael-daugherty-youth-conservative-outreach-for-the-rnc-raffi-williams/ (stating that Tiversa "wouldn't answer any questions other than they had it and prove they had it unless

we paid them"; "our property was turned over by them to the ... Federal Trade Commission");

• Interview by Marianne Kolbasuk McGee of Michael J. Daugherty, available at http://www.healthcareinfosecurity.com/interviews/labmd-ceodescribes- his-beefs-ftc-i-2184 ("We could not get any answers out of them as to how, where or what unless we hired them, which created a huge issue of distrust");

• 9/10/13 Panelist Briefing of Tech Freedom and Cause of Action, available at http://www.youtube.com/watch?v=MqfcDmBJgvc (stating that "no answers would come back unless we signed a services agreement"; stating that Tiversa's communication "gave us a real big brother feel, like who is watching us, here?"; responding to the question "and you said no and you fixed the problem yourself, and then they turned you over to the FTC" with the response "correct"; "we know someone came in and took" the File);

• Interview by Cindy Graves of Michael J. Daugherty, available at http://www.wbobradio.com/2014/10/0l/cindy-graves-show-hr-2-10114/   (stating that "he wouldn't tell us unless we paid him", that "he wouldn't give us any information unless we hired him ... ", that "it just was so creepy from the beginning, so Big Brother, ... ", that "he turns it over to the Feds", that "these guys were working - Homeland Security gave $24 million to Dartmouth and they use this company's technology .... And they were monitoring and taking possession of all these files ... ", that the FTC was "sitting with this company that's gathering the stuff. It's a private enterprise that's ... building ... this whole mountain of military information, tax records, medical records. They're taking possession of it", responding to the statement that "it looks like the government ... employed them to hack into your system and then say, ah hah! I hacked into your system. Now you need to pay me to - to plug that leak" with the statement "Right, right", stating that "[t]hey took my stuff");

• Interview by Stacy Harp of Michael J. Daugherty, available at http://www.blogtalkradio.com/acmedia/2014/10/01 /the-devil-inside-thebeltway-the-shocking-expose-of-the-govts-surveillance (stating that "he was setting us up. And he wouldn't tell us anything about how he got it unless we hired him", that "that was very creepy ....... it was a Big Brother type feel. It - it felt like a shakedown. It felt extortionistic. It did. If felt like this guy's not going to give us anything unless we paid him and hired him", stating that "here was a private company that's working with a funded study and a major university looking and monitoring us and downloading 13 million workstations - files ..... why is it theirs to take and hold and keep and not tell us what they've done with it or how they got it?", responding to the statement that "I'm hoping that this investigation, if there are any ties between Tiversa and the FTC that you know, there's a scratch each other's back kind of arrangement where people who don't buy our services, you know, you go after them, sue them and we'll take a cut, you know, we'll divvy up the loot. If such a thing is going on it wouldn't surprise me. I hope that that you know, hope

that comes out as part of this investigation" with the response that "Oh well, it's going on all right and I can talk about that").

36. In essence, Mr. Daugherty has echoed, in many different mediums, the main crux of the Book: that Tiversa and Mr. Boback illegally accessed and stole LabMD's files, and then extorted LabMD in an attempt to obtain business. When LabMD refused, according to Mr. Daugherty, Tiversa and Mr. Boback sent the files to the FTC, to begin an investigation into Lab MD. Thus, Mr. Daugherty and LabMD have accused Tiversa and Mr. Boback of being criminals, who have engaged in crimes involving crimen falsi, by being thieves, extortionists, con artists and parties to a government conspiracy somehow intended to defraud Mr. Daugherty and LabMD.

39. As described in Paragraphs 33-36, LabMD and Mr. Daugherty disregarded the November 8, 2012 letter entirely by making statements, and publishing the Book. Those statements, and the Book, therefore, were made with knowledge of their falsehood or reckless disregard for the fact that they were false.

40. Moreover, upon information and belief- both prior to and after publication of the Book - Mr. Daugherty became aware that LabMD files made available on a peer to peer file sharing network are "public" because of LabMD's downloading of Lime Wire.

41. Upon information and belief, in May 2013, Mr. Daugherty was informed that the allegations he had levied against Plaintiffs were false and betrayed a general misunderstanding of P2P technology. Mr. Daugherty elected to willfully ignore those warnings.

43. LabMD and Mr. Daugherty have willfully, intentionally, wantonly, maliciously, and repeatedly spread their allegations, targeted to Pennsylvania, regarding Pennsylvania residents, and with knowledge that those allegations would cause harm to those Pennsylvania residents in this Commonwealth.

44. LabMD's and Mr. Daugherty's allegations regarding Mr. Boback's and Tiversa's conduct are false and actionable.

52. Specifically, prior to Mr. Wallace's final disposition of the Tiversa stock which occurred on May 9, 2014, Mr. Wallace was allegedly in contact with the House Committee on Oversight and Government Reform in an effort to provide false and disparaging information regarding Tiversa. Upon information and belief, Mr. Wallace had also corresponded with LabMD and CoA to discuss providing false and disparaging information regarding Tiversa.

64. CoA and LabMD have knowingly ignored the falsehoods provided to them by Mr. Wallace in exchange for conspiring to act maliciously against Plaintiffs.

65. Any and all allegations of Mr. Wallace regarding nefarious activity of Tiversa

during Mr. Wallace's tenure as an employee are false. Any illegal or improper actions taken by Mr. Wallace while an employee of Tiversa, if any, were taken without Tiversa's knowledge, and were outside the scope of Mr. Wallace's employment with Tiversa.

68. Upon information and belief, the Committee's investigation was triggered by CoA providing the Committee with the false allegations made by Mr. Wallace.

98. There is no conditionally privileged occasion which exists to allow Mr. Daugherty or LabMD to have made the defamatory statements. In the alternative, Mr. Daugherty and LabMD, as demonstrated above, have abused a conditionally privileged occasion to the extent any exist, which Plaintiffs deny.

99. and 106.  Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and Lab MD have acted with actual malice.

100., 107. and 114. Mr. Daugherty's and LabMD's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on Mr. Daugherty and LabMD's part. Mr. Daugherty and LabMD had an appreciation for, and consciously disregarded, the risk of harm to Plaintiffs which their conduct entailed.

102. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and LabMD have acted with actual malice.

109. The statements made by Mr. Daugherty and LabMD, discussed in Paragraphs 31- 36, are false.

110. Mr. Daugherty and LabMD had no privilege to make these statements.

113. Mr. Daugherty and LabMD knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made. Mr. Daugherty and LabMD have acted with actual malice.

115. Upon information and belief the Committee's investigation into Tiversa was triggered by CoA's provision of Mr. Wallace's false statements regarding Tiversa.

123. The Defendants LabMD, Mr. Daugherty, CoA, and Mr. Wallace combined and agreed to - acting with the intent to injure the Plaintiffs through an unlawful act or through an otherwise lawful act but by unlawful means, and without justification to do so - and took actions in furtherance of their agreement to cause harm to Tiversa by, among other things and without limitation, interfering with its existing contractual relations.

124. The Defendants' behavior was not to petition the government for redress of grievances, but instead to corrupt governmental processes in an attempt to interfere directly with Tiversa's contractual relationships and, generally, to cause as much harm as possible to

Tiversa and Mr. Boback as nothing more than revenge for the perceived wrongful conduct of those parties.

128.     The allegations set forth above are false because (1) Tiversa illegally hacked into and took the 1718 File from a LabMD computer in Atlanta, Georgia on February 25, 2008, without LabMD's knowledge, authority or permission; (2) Tiversa illegally used law enforcement surveillance software owned by the federal government to search for, access and download the 1718 File from LabMD's computer; (3) the taking of the 1718 File violated several state and federal criminal statutes including, without limitation, 42 U.S.C. § 1320d-6 (Unlawful Possession and Use of Personal Health Information); (4) Tiversa never located or downloaded the 1718 File from any computer other than LabMD's computer in Atlanta, Georgia; (5) Tiversa's internal documents establish that Tiversa took the 1718 File *directly* and *solely* from a LabMD computer in Atlanta, Georgia; (6) Tiversa never located or downloaded the 1718 File from a computer in San Diego, California; (7) the 1718 File never "spread" anywhere in cyberspace; (8) the 1718 File was never found or downloaded from computers of known bad actors (*e.g.,* identity thieves); (9) the 1718 File was never publicly available; (10) LabMD did not leak the 1718 File; (11) Tiversa leaked the 1718 File; (12) Tiversa partnered with Dartmouth College to search for and take the 1718 File as part of a federally-funded study by Dartmouth; (13) Tiversa, through its attorney Jim Cook, threatened to turn LabMD in to the FTC if LabMD did not hire Tiversa; (14) Tiversa gave the FTC a list of approximately 100 companies Tiversa claimed leaked confidential files on the internet (some or all of those companies had rejected Tiversa's solicitations of business); (15) Tiversa attorney Eric Kline created The Privacy Institute at the suggestion of FTC investigator Ruth Yodaiken as a means for Tiversa to funnel documents to the FTC in secret; (16) Neither Tiversa nor The Privacy Institute ever produced anything to the FTC under "threat;" (17) Tiversa's reward for turning companies in to the FTC was its receipt of more business due, for example, to

prospective customers' fear of FTC investigations and prosecutions; (18) The FTC helped Tiversa secure more business by giving it advance notice of the companies to whom it was sending inquiry letters; (19) Tiversa's documentary evidence that Tiversa located and downloaded the 1718 File from a computer in San Diego, California (*e.g.*, CX0019, Chopra Affidavit) was fabricated; (20) Tiversa's documentary evidence of spread of the 1718 File (*e.g.*, CX0019, Chopra Affidavit) was fabricated; and (21) Boback's testimony regarding the alleged spread of the 1718 File was false.

129.    Each of the false allegations in the second amended complaint in the State Defamation Action, which also constituted defamation per se pursuant to 42 Pa.C.S. §§ 8353, injured the reputations of Daugherty and LabMD and chilled the sales of *The Devil Inside the Beltway*.

130.    The second amended complaint in the State Defamation Action caused Daugherty to suffer emotional distress.

131.    Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the allegations above were false.

132.    Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing that the claims in the second amended complaint in the State Defamation Action were invalid.

133.    Tiversa, Boback, Reed Smith and Shaw had no probable cause for the second amended complaint in the State Defamation Action.

134.    Neither Tiversa, Boback, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in the second amended complaint in the State Defamation Action were based.

135.    Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of the second amended complaint in the State Defamation Action was not intended to merely harass or maliciously injure Daugherty and LabMD.

136.    Neither Tiversa nor Boback reasonably believed in the existence of facts upon which the claims in the second amended complaint in the State Defamation Action were based due to reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

137.    On August 25, 2015, Daugherty was a case-study speaker at the Gartner Security & Risk Management Summit in Sydney, Australia.  Before Daugherty spoke, Boback called the organizers of that event to impugn Daugherty and attack his reputation.  Boback was trying to interfere with Daugherty's current and future speaking engagements.

138.    On November 15, 2015, Chief Administrative Law Judge Michael D. Chappell ruled in favor of LabMD after trial in the enforcement action.  A true and correct copy of Judge Chappell's decision is attached hereto Exhibit N.  The following are pertinent excerpts from that ruling:

– In order to retaliate against LabMD for refusing to purchase Tiversa's services, Mr. Wallace testified, Tiversa reported its discovery of the 1718 File to the FTC; and Mr. Wallace, at the direction of Mr. Boback, manipulated Tiversa's Data Store to make it appear that the 1718 File had been found at four IP addresses, including IP addresses of known identity thieves, and fabricated a list of those IP addresses, which Complaint Counsel introduced into evidence as CX0019. (p. 9)

– Mr. Boback was motivated to retaliate against LabMD for LabMD's refusal to purchase remediation services from Tiversa, including by making the disclosure of the 1718 File appear widespread and dangerous. (p. 33)

– Mr. Boback's motive to retaliate against LabMD for refusing to purchase remediation services from Tiversa (F. 157) resulted in Tiversa's decision to include LabMD in the information provided to the FTC in response to the FTC CID (F. 137) and in the creation of CX0019. (p. 33)

&ndash; Because of Mr. Boback's biased motive, Mr. Boback is not a credible witness concerning LabMD, the 1718 File, or other matters material to the liability of Respondent. (p. 33)

&ndash; There were "multiple times" when Mr. Boback would make statements that a company's documents had spread all over the Internet and then create the appearance that information was found in locations where it never existed. (Wallace, Tr. 1453-1454,1457-1458) (testifying to a highly publicized instance as one example). (p. 34)

&ndash; Having observed Mr. Boback's June 7, 2014 video deposition (RX0541 (Boback Trial Dep.); Tr. 1268-1269), taken by Respondent for purposes of trial testimony, Mr. Boback was evasive and lacked forthrightness in response to questioning. (p. 34)

&ndash; Based on F. 155-166, and observation of Mr. Boback's overall demeanor during the June 7, 2014 video deposition (RX0541 (Boback Trial Dep.)), Mr. Boback is not a credible witness concerning LabMD, the 1718 File, or other matters material to the liability of Respondent. (p. 34)

&ndash; Mr. Wallace's testimony, including without limitation regarding CX0019, is credited over any contrary testimony or other evidence provided by Boback or Tiversa. (p. 34)

139.    Despite Judge Chappell's findings, despite Wallace's testimony in the enforcement action, despite the findings of the OGR Staff, and despite the FTC's tacit recognition that CX0019 and Boback's testimony were false, Tiversa, Boback, Reed Smith and Shaw pressed forward with their malicious prosecution of Daugherty and LabMD in the State Defamation Action.

140.    On December 9, 2015, The Wall Street Journal published a letter from Boback that contained a number of defamatory statements about LabMD and Daugherty, including the following:

> LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed LimeWire file-sharing software on a company computer.  Doing so made confidential patient information publicly available over the Internet.

141.    Boback's defamatory statements in The Wall Street Journal were intended to and did injure the reputations of LabMD and Daugherty.

142.     On information and belief, Reed Smith and/or Shaw drafted or assisted in the drafting of Boback's defamatory statements in his letter to The Wall Street Journal.

143.    Reed Smith and Shaw either knew or should have known that Boback's letter contained false statements.

144.    On December 10, 2015, Daugherty was a speaker at the Black Hat Executive Summit in Scottsdale, Arizona.  Before Daugherty spoke, Boback contacted Brian Gillooly, co-chair of the event, to discuss Daugherty and LabMD.  Once again, Boback was trying to interfere with Daugherty's current and future speaking engagements.

145.    Tiversa headquarters were raided by the FBI on March 1, 2016, during the FBI and DoJ's investigation into false statements Boback made to Congress and the FTC.  As admitted by Ridge and Clark Hill in the State Defamation Action, the false statements being investigated by the DoJ include the same false statements that Tiversa, Boback, Reed Smith and Shaw have made in the Federal and State Defamation Actions.

146.    At some point after March 1, 2016, Tiversa terminated Boback.

147.    On March 10, 2016, Tiversa filed its Praecipe for Discontinuance in the State Defamation Action wherein Tiversa dismissed its claims with prejudice.  In addition, Reed Smith and Shaw withdrew from representing Boback.

148.    Ridge entered an appearance as counsel of record for Boback in the State Defamation Action on March 10, 2016.  From that point forward, Ridge and Clark Hill, along with Boback, are responsible for maliciously and in bad faith pursuing frivolous and dilatory claims against Daugherty and LabMD.

149.    Clark Hill and Ridge know or are grossly negligent in not knowing that the false statements Boback and others made in each of the complaints in the Federal and State Defamation Actions, as alleged above, are false.

150.     On October 9, 2017, Shaw served on LabMD Defendant Tiversa Holding Corp.'s Objections and Answers to Plaintiff LabMD Inc.'s Interrogatories in *LabMD, Inc. v. Tiversa Holding Corp., Robert J. Boback, et al*., in the United States District Court for the Western District of Pennsylvania, Civil Action No. 2:15-cv-00092-MPK, a true and correct copy of which is attached hereto, marked as Exhibit O and incorporated by reference herein.  When asked to identify (1) what hardware and software Tiversa used to search for, access and download the 1718 File; and (2) all search terms Tiversa used to locate the 1718 File, Tiversa and Shaw finally capitulated by adopting portions of Wallace's immunized testimony given in the enforcement action on May 5, 2015.  That testimony is attached hereto as Exhibit K.

151.     Tiversa and Shaw's capitulation on October 9, 2017, is an implicit admission that Boback's testimony in the enforcement action was false and that Tiversa's documentary evidence of spread (*e.g.,* Exhibits C, F and J hereto) was fabricated.

152.     The false statements made by Tiversa, Boback, Reed Smith and Shaw in the Federal and State Defamation Actions and amendments thereto, as alleged above, are defamatory in character as they have diminished Daugherty and LabMD's reputations – both commercially and personally - and have hurt Daugherty and LabMD's business and profession, by, *inter alia*, casting doubt on Daugherty and LabMD's operations as a businessman and business that operate legally, ethically, and honestly.

153.     Tiversa, Boback, Reed Smith and Shaw's false statements in the Federal and State Defamation Actions are directly applicable to Daugherty and LabMD, as they either name Daugherty or LabMD directly or make clear reference, in context, to Daugherty and LabMD.

154.    Any recipient of Tiversa, Boback, Reed Smith and Shaw's false statements in the Federal and State Defamation Actions would understand the defamatory meaning of those statements.

155.    Any recipient of Tiversa, Boback, Reed Smith and Shaw's false statements in the Federal and State Defamation Actions would understand that these statements are to be applied to Daugherty and LabMD, as Daugherty and LabMD are either named or implicated in context.

156.    Daugherty and LabMD have suffered special harm as a result of the publication of Tiversa, Boback, Reed Smith and Shaw's false statements in the Federal and State Defamation Actions, including, but not limited to, a diminished reputation in their field of business.

157.    Daugherty and LabMD are not public officials or public figures of any kind.

158.    There is no conditionally privileged occasion which exists to allow Tiversa, Boback, Reed Smith and Shaw to have made the defamatory statements. In the alternative, Tiversa, Boback, Reed Smith and Shaw, as demonstrated above, have abused a conditionally privileged occasion to the extent any exist, which Daugherty and LabMD deny.

159.    Tiversa, Boback, Reed Smith and Shaw knew, or reasonably should have known, of the falsity of each of their statements at the time those statements were made in the Federal and State Defamation Actions.

160.    Tiversa, Boback, Reed Smith, Shaw, Clark Hill and Ridge have at all times relevant to this action acted with actual malice toward Daugherty and LabMD.

161.    Tiversa, Boback, Reed Smith, Shaw, Clark Hill and Ridge's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton and reckless behavior on their part. Tiversa, Boback, Reed Smith, Shaw, Clark Hill and Ridge had an appreciation for, and consciously disregarded, the risk of harm to Daugherty and LabMD which their conduct entailed.

## COUNT I – COMMON LAW USE OF PROCESS CLAIM
### (Against all Defendants)

162.    Daugherty and LabMD incorporate the foregoing paragraphs of their complaint as if stated in full herein.

163.    Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge used, and Clark Hill, Boback and Ridge are continuing to use, the State Defamation Action against Daugherty and LabMD primarily to accomplish a purpose for which that process was not designed with the result that harm has been caused to Daugherty and LabMD.

164.    Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge committed, and Clark Hill, Boback and Ridge are continuing to commit, acts and threats against Daugherty and LabMD that are not authorized by the Allegheny County Court of Common Pleas with the result that harm has been caused to Daugherty and LabMD.

165.    Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge aimed, and Clark Hill, Boback and Ridge are continuing to aim, at objectives not legitimate in the use of the Allegheny County Court of Common Pleas with the result that harm has been caused to Daugherty and LabMD.

166.    Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge used, and Clark Hill, Boback and Ridge continue to use, the State Defamation Action maliciously and with design to oppress Daugherty and LabMD.

167.    Tiversa, Reed Smith, Boback and Shaw filed and maintained, and Clark Hill, Boback and Ridge continue to maintain, the State Defamation Action without probable cause and with malice.

168.    As to Tiversa, Reed Smith and Shaw, the State Defamation Action against Daugherty and LabMD was unsuccessful.

169.   Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge are jointly and severally liable to Daugherty and LabMD.

170.   As a proximate result of Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge's misconduct set forth herein, Daugherty and LabMD were harmed and continue to be harmed in amounts to be proven at trial.

## COUNT II – COMMON LAW ABUSE OF PROCESS CLAIM
### (Against all Defendants)

10.   Daugherty and LabMD incorporate the foregoing paragraphs of their complaint as if stated in full herein.

11.   After process issued, Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge abused, and Clark Hill, Boback and Ridge are continuing to abuse, the State Defamation Action against Daugherty and LabMD primarily to accomplish a purpose for which that process was not designed with the result that harm has been caused to Daugherty and LabMD.

12.   After process issued, Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge employed, and Clark Hill, Boback and Ridge continue to employ, the State Defamation Action for an unlawful object, not the purpose of which it is intended by the law to effect.

13.   After process issued, Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge committed, and Clark Hill, Boback and Ridge are continuing to commit, acts and threats against Daugherty and LabMD that are not authorized by the Allegheny County Court of Common Pleas with the result that harm has been caused to Daugherty and LabMD.

14.   After process issued, Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge aimed, and Clark Hill, Boback and Ridge are continuing to aim, at objectives not legitimate in the abuse of the Allegheny County Court of Common Pleas with the result that harm has been caused to Daugherty and LabMD.

15.     After process issued, Tiversa, Reed Smith, Boback and Shaw maintained, and Clark

Hill, Boback and Ridge continue to maintain, the State Defamation Action without probable cause

and with malice.

16.     As to Tiversa, Reed Smith and Shaw, the State Defamation Action against

Daugherty and LabMD was unsuccessful.

17.     Tiversa, Reed Smith, Clark Hill, Boback, Shaw and Ridge are jointly and severally

liable to Daugherty and LabMD.

18.     As a proximate result of Tiversa, Reed Smith, Clark Hill, Boback, Shaw and

Ridge's misconduct set forth above, Daugherty and LabMD were harmed and continue to be

harmed in amounts to be proven at trial.

### COUNT III – DRAGONETTI ACT CLAIM
### (Against Tiversa, Reed Smith and Shaw)

19.     Daugherty and LabMD incorporate the foregoing paragraphs of their complaint as

if stated in full herein.

20.     The Federal Defamation Action was procured, initiated and continued by Tiversa,

Reed Smith and Shaw against LabMD and Daugherty in a grossly negligent if not intentional

manner, without probable cause and primarily for a purpose other than that of securing proper

discovery, joinder of parties and adjudication of the claims in that lawsuit.

21.     The State Defamation Action was procured, initiated and continued by Tiversa,

Reed Smith and Shaw against LabMD and Daugherty in a grossly negligent if not intentional

manner, without probable cause and primarily for a purpose other than that of securing proper

discovery, joinder of parties and adjudication of the claims in that lawsuit.

22.     Tiversa's claims against Daugherty and LabMD terminated in favor of Daugherty

and LabMD on March 10, 2016, when Tiversa filed its Praecipe for Discontinuance in the State

Defamation Action wherein Tiversa dismissed all claims against Daugherty and LabMD with prejudice.

23.     The primary purpose of the Federal and State Defamation Actions was not to secure proper discovery, joinder of parties and adjudication of the claims but, instead, to (1) maliciously sue Daugherty and LabMD in state and federal courts in Pittsburgh for meritless defamation, conspiracy and other claims; (2) drain Daugherty and LabMD of their limited resources; (3) chill the sales of *The Devil Inside the Beltway*; (4) divert Daugherty and LabMD's attention from taking discovery and defending LabMD in the enforcement action; (5) retaliate against Daugherty and LabMD for refusing to do business with Tiversa, for refusing to settle with the FTC and for pursing discovery against Tiversa in the enforcement action; (6) intimidate, harass and antagonize Daugherty and LabMD to wear them down and force them to capitulate; (7) terminate an employee (Wallace) who refused to lie for Tiversa in the enforcement action; (8) hire private investigators (CSI and InPax) to investigate, intimidate, harass, photograph, track, trail, antagonize and surveil witnesses and their family members; (9) have Boback contact the Gartner Group, Black Hat and other organizers of events where Daugherty would be speaking to defame and impugn the character of Daugherty to ruin his speaking career; (10) direct Tiversa employee Keith Tagliaferri to create a false report regarding the alleged spread of the 1718 File; (11) coordinate efforts with and assist the FTC in its prosecution of LabMD; (12) give false testimony in two depositions in the enforcement action (Boback); (13) interfere with LabMD's efforts to obtain immunity for a whistleblower (Wallace); (14) with Reed Smith and Shaw's assistance, author and publish defamatory statements about Daugherty and LabMD including, without limitation, Boback's February 10, 2015 statements published in the Pathology Blawg and Boback's December 9, 2015 statements published in The Wall Street Journal; (15) intimidate and drain LabMD's pro bono law

firm of its financial resources and divert its attention from defending LabMD in the enforcement action; (16) foster and disseminate Tiversa's lies about finding the 1718 File on the computers of known bad actors; (17) fabricate supporting evidence for the FTC to use in its prosecution of LabMD and for Tiversa to use in its defamation lawsuits against LabMD and Daugherty; (18) coerce Tiversa chief technology officer Anju Chopra to sign a false affidavit; and, upon information and belief, (19) avoid exposure of the Concealed Misconduct; and (20) conspire with former U.S. Attorney Mary Beth Buchanan to conceal Tiversa's illegal use of EP2P.

24.     Each of the claims in all of the complaints in the Federal and State Defamation Actions were premised on allegations Tiversa and Boback knew and Reed Smith and Shaw either knew or were grossly negligent in not knowing to be false.

25.     There was no probable cause for any of the complaints in the Federal and State Defamation Actions.

26.     Neither Tiversa, Reed Smith nor Shaw reasonably believed in the existence of facts upon which the claims in any of the complaints in the Federal and State Defamation Actions were based.

27.     Neither Reed Smith nor Shaw believed in good faith that their procurement, initiation or continuation of any of the complaints in the Federal and State Defamation Actions was not intended to merely harass or maliciously injure Daugherty and LabMD.

28.     Tiversa did not reasonably believe in the existence of facts upon which the claims in any of the complaints in the Federal and State Defamation Actions were based due to reliance upon counsel sought in good faith and given after full disclosure of all relevant facts within their knowledge and information.

29.     Daugherty and LabMD have been harmed in at least the following ways:

- Harm to their reputations by the defamatory matters alleged as the basis of the Federal and State Defamation Actions (and amendments thereto);

- Expense, including any reasonable attorney fees, that they have reasonably incurred in defending themselves against the Federal and State Defamation Actions (and amendments thereto);

- Specific pecuniary losses that have resulted from the Federal and State Defamation Actions (and amendments thereto);

- For Daugherty, emotional distress caused by the Federal and State Defamation Actions (and amendments thereto); and

- Punitive damages.

30.    Tiversa, Reed Smith and Shaw are jointly and severally liable to Daugherty and LabMD.

31.    As a proximate result of Tiversa, Reed Smith and Shaw's misconduct set forth above, Daugherty and LabMD were harmed in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Michael J. Daugherty and LabMD, Inc. respectfully pray for the following relief:

(a)    that Daugherty and LabMD receive a trial by jury;

(b)    that the Court enter judgment in favor of Daugherty and LabMD, and against defendants in amount(s) to be proven at trial, including awarding against each defendant actual, special, consequential, presumed and/or compensatory damages;

(c)    that judgment be entered awarding to Daugherty and LabMD, and against each defendant, punitive damages;

(d)    that Daugherty and LabMD be awarded their expenses and costs and disbursements of litigation, including their costs and reasonable attorneys' fees;

(e)      that, pursuant to 42 Pa.C.S. §§ 8355, Daugherty and LabMD be awarded a civil

penalty of $10,000 for every pleading, motion or other paper signed by Reed Smith and

Shaw in the Federal and State Defamation Actions;

(f)      that Daugherty and LabMD be awarded pre-judgment and post-judgment interest

as provided by Pennsylvania law; and

(g)      that Daugherty and LabMD be awarded such other relief as the Court deems just,

equitable and proper.

**JURY TRIAL DEMANDED.**


Dated: October 22, 2017                              Respectfully submitted,

                                                     **JAMES W. HAWKINS, LLC**

                                                     */s/ James W. Hawkins*
                                                     James W. Hawkins
                                                     *Admission for pro hac vice pending*
                                                     Georgia State Bar No. 338767
                                                     JAMES W. HAWKINS, LLC
                                                     11339 Musette Circle
                                                     Alpharetta, GA 30009
                                                     V: 678-697-1278
                                                     F: 678-540-4515
                                                     jhawkins@jameswhawkinsllc.com

                                                     *Attorney for Plaintiff LabMD, Inc. and*
                                                     *Michael J. Daugherty*